IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GRACO INC. and<br>GRACO MINNESOTA INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C. A. No. 21-245 (CFC) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CARLISLE CONSTRUCTION<br>MATERIALS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| CARLISLE CONSTRUCTION<br>MATERIALS, LLC, and CARLISLE<br>COMPANIES, INC., | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRACO INC. and<br>GRACO MINNESOTA INC., | ) | |
| | ) | |
| Counterclaim Defendants. | | |

**FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT
AND COUNTERCLAIMS**

Defendant Carlisle Construction Materials, LLC's ("Carlisle") demands a trial

by jury on all issues so triable and answers the first amended complaint of Plaintiffs

Graco Inc. and Graco Minnesota Inc. (collectively "Plaintiffs" or "Graco") and states

its affirmative defenses and counterclaims against Plaintiffs as follows:

## PARTIES

1.    Upon information and belief, admitted.

2.    Upon information and belief, admitted.

3.    Admitted except that Carlisle is a limited liability company, not a corporation.

## FACTUAL BACKGROUND

4.    Carlisle lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 and therefore denies them.

5.    Carlisle lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 and therefore denies them.

6.    Carlisle admits that United States Patent No. RE46,002 ("the '002 patent") is titled "Plural Component Stray Gun for Fast Setting Materials" and that the '002 patent appears on its face to have issued on May 17, 2016.  Carlisle admits that a copy of what appears to be the '002 patent is attached to Plaintiffs' complaint as Exhibit A.  Carlisle lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegation that Graco Minnesota is the owner of the '002 patent and therefore denies it.

7.     Carlisle admits that United States Patent No. 7,527,172 ("the '172 patent") is titled "Plural Component Mixing and Dispensing Apparatus" and that the '172 patent appears on its face to have issued on May 5, 2009.  Carlisle admits that

a copy of what appears to be the '172 patent is attached to Plaintiffs' complaint as Exhibit B. Carlisle lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegation that Graco Minnesota is the owner of the '172 patent and therefore denies it.

8.    Carlisle admits that Plaintiffs have brought an action for patent infringement of the '002 and '172 patents and that these patents are therefore the "Patents-in-Suit."

9.    Carlisle admits that the Patents-in-Suit appear to relate to spray gun assemblies. Carlisle denies the remaining allegations in paragraph 9.

10.    Carlisle admits that it makes, uses, offers for sale, and sells its ST1 spray gun alone, and in connection with its IS40 IntelliSpray Proportioner. Carlisle denies the remaining allegations in paragraph 10.

## JURISDICTION AND VENUE

11.    Carlisle admits that Plaintiffs have brought an action under the patent laws of the United States, 35 U.S.C. § 1, et seq., but denies that Carlisle has committed or is committing acts of patent infringement. Carlisle admits that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

12.    Carlisle admits that it is a Delaware limited liability company and that, for purposes of this action only, this Court has personal jurisdiction over it. Carlisle

3

denies all remaining allegations of paragraph 12, including that it has committed the complained-of acts of patent infringement in Delaware or anywhere else.

13.    Admitted.

## COUNT 1: INFRINGEMENT OF U.S. PATENT NO. RE 46,002[1]

14.    Carlisle incorporates by reference its answers to paragraphs 1 through 13 as if fully set forth herein.

15.    Denied.

16.    Denied.

17.    Carlisle admits that the ST1 is a spray gun for fast setting plural component materials.  Carlisle admits that the ST1 Service Manual states that the ST1 is an "air purge spray gun."  Carlisle admits that the ST1 is a plural component spray gun.  Carlisle denies the remaining allegations of paragraph 17.

18.    Paragraph 18 contains Plaintiffs' legal conclusions that the identified portion of the ST1 is a "gun body" as recited in claim 11 of the '002 patent.  To the extent a response is required, Carlisle denies the allegations of this paragraph.

19.    Paragraph 19 contains Plaintiffs' legal conclusions that the identified portion of the ST1 is an "air cap" as recited in claim 11 of the '002 patent.  To the extent a response is required, Carlisle denies the allegations of this paragraph.

---

[1]    Count 1 was dismissed on Dec. 20, 2021 pursuant to Dkt. No. 044 granting the parties' Joint Motion To Dismiss, Dkt. 043.

20.     Paragraph 20 contains Plaintiffs' legal conclusions that the identified portion of the ST1 "comprises a fluid housing attached to said gun body, and receiving said air cap" as recited in claim 11 of the '002 patent.  To the extent a response is required, Carlisle denies the allegations of this paragraph.

21.     Carlisle admits that the ST1 Service Manual labels a "mixed chamber." The remainder of Paragraph 21 contains Plaintiffs' legal conclusions that the identified portion of the ST1 is a "mixed chamber located in said fluid housing" as recited in claim 11 of the '002 patent.  To the extent a response is required, Carlisle denies the allegations of this paragraph.

22.     Carlisle admits that the ST1 Service Manual labels a passage as "purge air."  The remainder of Paragraph 22 contains Plaintiffs' legal conclusions that the identified portion of the ST1 is a "purge air passage" as recited in claim 11 of the '002 patent.  To the extent a response is required, Carlisle denies the allegations of this paragraph.

23.     Carlisle admits that the ST1 Service Manual identifies a "grease fitting."  The remainder of Paragraph 23 contains Plaintiffs' legal conclusions that the identified portion of the ST1 is a "grease fitting connected to said purge air passage through which grease is injected into the fluid housing for storage" as recited in claim 11 of the '002 patent. To the extent a response is required, Carlisle denies the allegations of this paragraph.

24.    Denied.

25.    Denied.

## COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 7,527,172

26.    Carlisle incorporates by reference its answers to paragraphs 1 through 25 as if fully set forth herein.

27.    Denied.

28.    Denied.

29.    Paragraph 29 contains Plaintiffs' legal conclusions that the ST1 comprises "a mixing and spraying element for a plural component spraying apparatus," as recited in claim 10 of the '172 patent.  To the extent a response is required, Carlisle denies the allegation of this paragraph.

30.    Paragraph 30 contains Plaintiffs' legal conclusions that the ST1 comprises "a two-part assembly having a forward part and a rearward part, and forming an unobstructed cylindrical internal mixing chamber to provide mixing and spraying of the mixed plural components," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

31.    Paragraph 31 contains Plaintiffs' legal conclusions that the ST1 comprises a "planar and opposed side portions forming a rearward internal mixing chamber portion including an unobstructed central passageway with a cylindrical

side wall extending to its forward end," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

32.    Paragraph 32 contains Plaintiffs' legal conclusions that the ST1 comprises a "rearward part that has at least two admission passages having cylindrical side walls, with each admission passage extending between each of the planar and opposed outer side portions and the unobstructed central passageway and with its cylindrical sidewall being tangent to the cylindrical sidewall of the rearward internal mixing chamber portion," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

33.    Denied.

34.    Paragraph 34 contains Plaintiffs' legal conclusions that the ST1 comprises "the cylindrical side wall of the rearward internal mixing chamber portion has a diameter greater than the diameters of the cylindrical side walls of the admission openings, said rearward part being adapted at its forward end to accept the insertion of the forward part," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

35.    Paragraph 35 contains Plaintiffs' legal conclusions that the ST1 comprises "a forward internal mixing chamber portion including an unobstructed central passageway with a cylindrical side wall forming a spraying orifice at its forward termination, said forward part being adapted at its rear for insertion and

joining with the rearward part, the unobstructed central passageway of the forward part being located for open communication with the unobstructed central passageway of the rearward part when inserted and joined with the rearward part," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

36.    Paragraph 36 contains Plaintiffs' legal conclusions that the ST1 comprises "the cylindrical sidewall of the unobstructed central passageway of the rearward part has a larger diameter than the unobstructed central passageway of the forward part," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

37.    Paragraph 37 contains Plaintiffs' legal conclusions that the ST1 comprises "the sum of the cross-sectional areas of the cylindrical admission passages are substantially equal to the cross sectional area of the spraying orifice," as recited in claim 10 of the '172 patent. To the extent a response is required, Carlisle denies the allegation of this paragraph.

38.    Denied.

39.    Denied.

## **JURY DEMAND**

Carlisle requests a jury trial on all issues triable by jury.

## PRAYER FOR RELIEF

The First Amended Complaint recites a prayer for relief for which no response is required. To the extent an answer is required, Carlisle denies that Plaintiffs are entitled to any remedy or relief.

## GENERAL DENIAL

Carlisle denies all allegations in Plaintiffs' First Amended Complaint not expressly admitted.

## DEFENSES

Without any admission as to the burden of proof, burden of persuasion, or the truth of any allegation in the Amended Complaint, Carlisle relies upon the following defenses, whether pled as an affirmative defense or otherwise:

### First Defense (Non-Infringement)

Carlisle does not infringe (literally or under the doctrine of equivalents), and has not infringed, any valid and enforceable claim of the Asserted Patents.

### Second Defense (Invalidity)

The Asserted Patents are invalid for failure to satisfy one or more of the conditions and requirements of patentability set forth in 35 U.S.C. §§ 101 et seq., including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112, or under any of the judicially created doctrines of invalidity.

## Third Defense (Failure to State a Claim)

The Amended Complaint fails to state a claim upon which relief can be granted.

## Fourth Defense (No Exceptional Case)

Carlisle's actions in defending this case do not give rise to an exceptional case in Plaintiffs' favor under 35 U.S.C. § 285.

## Fifth Defense (Statute of Limitations)

Plaintiffs' claim for damages for infringement of the '172 patent is limited by 35 U.S.C. § 286.

## Sixth Defense (Prosecution History Estoppel)

Plaintiffs are barred under the doctrine of prosecution history estoppel from asserting any scope of the Asserted Patents that would cover the accused products because of statements and amendments made during prosecution of the applications that led to the Asserted Patents.

## Seventh Defense (No Injunctive Relief)

Plaintiffs are not entitled to preliminary and/or permanent equitable relief, including but not limited to a preliminary and/or permanent injunction because they cannot meet any of the multi-factor tests required for demonstrating a right to such injunctive relief.

**Eighth Defense (Inequitable Conduct)**

The '172 patent is unenforceable due to inequitable conduct before the USPTO during the prosecution and *inter partes* review of the '172 patent.

<u>**CARLISLE'S COUNTERCLAIMS AND DECLARATORY JUDGMENT COUNTERCLAIMS**</u>

Defendant/Counterclaim-Plaintiff Carlisle Construction Materials, LLC and Counterclaim-Plaintiff Carlisle Companies, Inc. (together "Carlisle") demand a trial by jury on all issues so triable and asserts the following counterclaims against Plaintiffs/Counterclaim-Defendants Graco Inc. and Graco Minnesota Inc. (collectively "Plaintiffs" or "Graco"):

<u>**PARTIES**</u>

1.      Carlisle Companies, Inc. is a Delaware corporation with a principal place of business at 16430 N. Scottsdale Road, Suite 40, Scottsdale, AZ 85254.

2.      Carlisle Construction Materials, LLC is a Delaware limited liability company with a principal place of business at 1285 Ritner Highway, Carlisle, PA 17013.

3.      Upon information and belief, Graco Inc. is a Minnesota corporation with a principal place of business at 88 11th Ave N.E., Minneapolis, Minnesota 55413.

4.      Upon information and belief, Graco Minnesota Inc. is a Minnesota corporation with a principal place of business at 88 11th Ave N.E., Minneapolis,

Minnesota, 55413.  Upon information and belief, Graco Minnesota Inc. is a wholly owned subsidiary of Graco Inc.

## NATURE OF THE ACTION

5.    Carlisle seeks a declaratory judgment under the patent laws of the United States, 35 U.S.C. § 100 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., that U.S. Patent No. RE46,002 ("the '002 patent) and U.S. Patent No. 7,527,172 ("the '172 patent") are invalid and/or not infringed and that the '172 patent is unenforceable due to inequitable conduct during prosecution.

6.    Carlisle also seeks judgment that Graco has violated Section 2 of the Sherman Act, 15 U.S.C. §§ 2, by monopolizing and attempting to monopolize the U.S. and North American markets for both fast-set equipment generally and plural component guns specifically through its wrongful assertion of the '172 patent, which Graco obtained by committing fraud on the USPTO during prosecution of the '172 patent.

## JURISDICTION AND VENUE

7.    This Court has exclusive subject matter jurisdiction over these claims pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331, 1338, the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Sherman Act, 15 U.S.C. §§ 2, 15, 26.

8.      This Court has personal jurisdiction over each of Graco Inc. and Graco Minnesota Inc. because each has subjected itself to the jurisdiction of this Court by filing their Complaint.

9.      Graco Minnesota Inc. purports to be the owner by assignment of the '002 and '172 patents.

10.     Venue in this Court is proper based on the choice of forum by Plaintiffs and pursuant to 28 U.S.C. §§ 1391(b) – (c).

### GRACO'S CLAIMS AGAINST CARLISLE

11.     Graco filed a lawsuit against Carlisle on February 22, 2021 asserting that Carlisle infringes the '002 and '172 patents.  On April 28, 2021, Graco filed an amended complaint which continued to assert that Carlisle infringes the '002 and '172 patents.

### COUNT I[2]

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '002 PATENT

12.     Carlisle repeats and re-alleges paragraphs 1-9 as if fully set forth herein.

13.     Graco has brought a claim against Carlisle alleging infringement of at least claim 11 of the '002 patent.

---

[2]      Count I was dismissed on Dec. 20, 2021 pursuant to Dkt. No. 044 granting the parties' Joint Motion To Dismiss, Dkt. 043.

14.     A real, immediate, and justiciable controversy exists between Carlisle and Graco regarding Graco's allegations that Carlisle infringes the '002 patent.

15.     Carlisle's ST1 spray gun does not meet each and every limitation of claim 11 of the '002 patent.  The ST1 does not have at least an "air cap" as required by claim 11.

16.     Carlisle is entitled to a declaratory judgment that Carlisle does not infringe, and has not infringed any valid and enforceable claim of the '002 patent, either literally or under the doctrine of equivalents.

17.     This is an exceptional case entitling Carlisle to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT II[3]

## DECLARATORY JUDGMENT OF THE INVALIDITY OF THE '002 PATENT

18.     Carlisle repeats and re-alleges paragraphs 1-15 as if fully set forth herein.

19.     Carlisle alleges that the claims of the '002 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 102, 103, and/or 112.

---

[3]     Count II was dismissed on Dec. 20, 2021 pursuant to Dkt. No. 044 granting the parties' Joint Motion To Dismiss, Dkt. 043.

20.    A real, genuine, and justiciable controversy exists between Carlisle and Graco regarding the validity of the claims of the '002 patent.

21.    Carlisle is entitled to a declaration that one or more claims of the '002 patent are invalid.  The '002 patent is invalid at least as anticipated and/or obvious in view of U.S. Patent No. 5,226,565; U.S. Patent No. 4,376,512; U.S. Patent No. 6,669,112; U.S. Patent 5,102,051; U.S. Patent No. 5,209,405; and U.S. Patent No. 6,409,098.

22.    This is an exceptional case entitling Carlisle to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT III

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '172 PATENT

23.    Carlisle repeats and re-alleges paragraphs 1-20 as if fully set forth herein.

24.    Graco has brought a claim against Carlisle alleging infringement of at least claim 10 of the '172 patent.

25.    A real, immediate, and justiciable controversy exists between Carlisle and Graco regarding Graco's allegations that Carlisle infringes the '172 patent.

26.    Carlisle's ST1 spray gun does not meet each and every limitation of claim 10 of the '172 patent.  The ST1 does not have at least two admission passages

having cylindrical side walls that are tangent to the cylindrical side wall of a rearward internal mixing chamber portion, as required by claim 10.

27.    Carlisle is entitled to a declaratory judgment that Carlisle does not infringe and have not infringed, any valid and enforceable claim of the '172 patent, either literally or under the doctrine of equivalents.

28.    This is an exceptional case entitling Carlisle to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT IV

## DECLARATORY JUDGMENT OF THE INVALIDITY OF THE '172 PATENT

29.    Carlisle repeats and re-alleges paragraphs 1-26 as if fully set forth herein.

30.    Carlisle alleges that the claims of the '172 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 102, 103, and/or 112.

31.    A real, genuine, and justiciable controversy exists between Carlisle and Graco regarding the validity of the claims of the '172 patent.

32.    Carlisle is entitled to a declaration that one or more claims of the '172 patent are invalid.  The '172 patent is invalid as anticipated and/or obvious at least in view of U.S. Patent No. 5,170,939; GB 1381556; WO 02/16227; and U.S. Patent No. 6,328,229.

16

33.    This is an exceptional case entitling Carlisle to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT V

## DECLARATORY JUDGMENT OF UNENFORCABILITY DUE TO INEQUITABLE CONDUCT OF THE '172 PATENT

34.    Carlisle repeats and re-alleges paragraphs 1-33 as if fully set forth herein.

## Introduction

35.    Carlisle seeks a judgment that the '172 Patent is unenforceable because Graco committed inequitable conduct during the prosecution of the '172 Patent.

36.    The '172 Patent describes an alleged improvement of the mixing and dispensing element commonly used in a prior art spray foam gun that was released on the market in the 1970s.  Claim 1 of the '172 Patent claims an "improvement":

> the improvement wherein said mixing and dispensing element comprises two parts with said dispensing orifice being formed in a forward part and said cylindrical admission passages being formed in a rearward part and with the unobstructed air purge-able cylindrical mixing chamber extending forwardly from the admission passages through the two parts to the dispensing orifice, each of the admission passages having a cylindrical sidewall with a lesser diameter than the cylindrical sidewall of the mixing chamber, and each of the cylindrical sidewalls of the admission passages crossing and being tangent to the cylindrical sidewall of the mixing chamber at its intersection with the cylindrical sidewall of the mixing chamber, the sum of the cross-sectional areas of the cylindrical admission passages being substantially equal to the cross-sectional area of the dispensing orifice.

17

37.     In essence, the claimed "improvement" of claim 1 is a mixing and dispensing element (1) comprised of two parts, (2) having admission passages with sidewalls tangent to the sidewall of the mixing chamber, and (3) having the sum of cross-sectional areas of the admission passages being substantially equal to the cross-sectional area of the dispensing orifice.    These purported claimed improvements to the mixing and dispensing element were features in the Probler Spray Foam Gun ("Probler 1") that the '172 Patent admits was on the market for decades prior to the filing of the application for the '172 Patent.  At least claim 1 of the '172 Patent would not have issued had the U.S. Patent and Trademark Office been provided with the details regarding the Probler 1 spray gun.

38.     The '172 Patent is unenforceable due to inequitable conduct of Jonathan McMichael and Steven Sinders in conjunction with prosecuting attorney David Badger in failing to disclose key information known to them regarding the Probler 1 that is prior art to the '172 Patent.  Each of these individuals was directly involved in the prosecution of the '172 Patent, either by prosecuting it, acting as the named inventor, or serving as the Patent Owner's head of research and development and working directly with the patent attorney to submit a sworn declaration to the USPTO to overcome rejection of the claims and secure issuance of the patent.  Each of these individuals therefore had a duty of candor and good faith in dealing with the United States Patent and Trademark Office ("USPTO"), which includes a duty to

disclose to the USPTO all information known to that individual to be material to patentability. A violation of this duty of disclosure can result in a finding of inequitable conduct. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (*en banc*). Each of these individuals had years of experience working for the original patent owner, GlasCraft, and/or its parent company, Ransburg, and had direct knowledge of the Probler 1 which was developed in the 1970s.

39.    These individuals deliberately did not disclose key information about the Probler 1 spray gun to the USPTO that would have resulted in at least claim 1 of the '172 Patent not being allowed, and they did so with the specific intent to deceive the USPTO into allowing the '172 Patent.

40.    Additionally, these individuals knew that the USPTO had rejected the claimed dimensions and ratios as unpatentable and stated that the applicant needed to show enhanced or unexpected results to overcome that rejection. Mr. Sinders, in connection with Mr. Badger, submitted a sworn declaration that falsely stated and materially misled the USPTO by stating that the claimed dimensions and ratios provided unexpected and enhanced benefits over the prior art, when those dimensions and ratios were disclosed in the Probler 1 spray foam gun.

41.    But for the material omissions and misrepresentations by the three individuals involved in prosecution, the USPTO would not have allowed at least one claim of the '172 Patent.

42.    The single most reasonable inference is that each individual involved in the prosecution misrepresented or omitted information with an intent to deceive the USTPO.

43.    Because of this inequitable conduct during prosecution, the '172 Patent should be declared unenforceable. *Id.* at 1288 ("[I]nequitable conduct regarding any single claim renders the entire patent unenforceable.").

## Inequitable Conduct Relating To The Probler 1 Spray Foam Gun

44.    Jonathon R. McMichael ("McMichael") began working at GlasCraft in 1999 when the Probler 1 spray foam gun was the leading spray foam gun offered by the company.  Mr. McMichael worked as a research and development engineer for GlasCraft and is the sole named inventor of the '172 Patent.

45.    Steven Sinders ("Sinders") was also an employee of GlasCraft (now Graco) since 1981, spending years at the company while the Probler 1 spray foam gun was the leading spray foam gun offered by the company.  Mr. Sinders also worked with Dick Probst, the original designer of the Probler 1 spray foam gun.  By the time the '172 Patent was prosecuted, Mr. Sinders was head of research and development for GlasCraft, and Mr. McMichael reported to Mr. Sinders.  By the

20

nature of his position in the company and experience, Mr. Sinders was directly involved in prosecution of the '172 Patent and submitted a declaration to the USPTO during prosecution of the patent.

46.    The '172 Patent was filed on November 15, 2004 and related to the design work that was being performed on the Probler 2 spray foam gun at GlasCraft by the Head of Research and Development, Mr. Sinders, and an engineer, Mr. McMichael.

47.    GlasCraft had long manufactured the Probler 1 spray foam gun since the 1970s. The Probler 1 was the foundation of the design work that led to the Probler 2 spray foam gun and the '172 Patent. Patent protection for the Probler 1 spray foam gun had lapsed following expiration of 1970s Pat. No. 3,799,403 to Probst et al. ("Probst 403") and the design had entered the public domain at that time. As such, other companies entered the market with spray foam guns similar in design to the Probler 1. Accordingly, there was a desire at GlasCraft to refresh the design of the Probler gun to maintain sales. On information and belief, GlasCraft also desired to renew their patent protection in order to maintain their competitive edge in the market.

48.    Attorney David H. Badger ("Badger") prosecuted the '172 Patent. Before going to law school, Mr. Badger was an engineer for Ransburg, GlasCraft's parent company, in the 1960s. After law school, Mr. Badger worked as a patent

21

attorney for GlasCraft, prosecuting U.S. Patent No. 3,799,403 to Probst, which is the patent that relates to the Probler 1 spray foam gun.  At the time of prosecution, Mr. Badger had nearly 30 years of experience as a patent attorney and was also an experienced engineer in the field of the patent due to his prior work at Ransburg.

49.     Mr. McMichael, Mr. Sinders, and Mr. Badger committed inequitable conduct before the USPTO by failing to disclose non-cumulative prior art concerning the Probler 1 spray foam gun that is but-for material to the patentability of at least one claim of the '172 Patent.  Moreover, each of them knew of, but deliberately failed to inform the USPTO of this prior art.  They each knew of the Probler 1 spray foam gun because they mentioned it in the background of the '172 Patent. '172 Patent at 1:49-51, 2:39-41 ("Plural component guns like those disclosed in the Probst et al. patent have been sold for almost 30 years by Glas-Craft, Inc., with the registered trademark PROBLER®.").  Mr. Badger had knowledge of the Probler 1 spray foam gun and the materiality of its design because he drafted the '172 Patent and discussed the Probler 1 in the patent background.  Mr. Badger was also involved with the prosecution of the Probst '403 patent that relates to Probler 1 and the '172 patent that relates to Probler 2 and, on information and belief, had access to and knowledge of the specific designs of both products.  For instance, Mr. Sinders testified that "Dave Badger would have wrote [the '172 Patent].  He would have put

that verbiage in there" and "[Dave Badger would have] seen the product, he has seen the prints, he knows the tolerances." Sinders Dep. Tr. at 210:15-16, 211:1-2.

50.    Mr. Sinders knew that the design of the Probler 1 was material and confirmed that he was familiar with the mixing chamber design and drawings for the Probler 1. *Id*. at 129:20-138:21. Mr. Sinders has admitted to his knowledge of the Probler 1 spray foam gun, including the details of its design. He first saw a Probler 1 spray gun when he started at GlasCraft in the 1980s. *Id.* at 53:5-8. He "know[s] of [the Probler 1] design very well." *Id.* at 33:12-16. He knew that the Probler 1 mixing chamber was formed of two pieces welded together. *Id.* at 133:21-135:11, 245:13-246:16. He knew that the "rapid whirling movement of the streams entering the mixing chamber tangentially" that the '172 patent describes was "the same as" the Probler 1 design. *Id.* at 105:19-106:12. He admitted that in developing the mixing chamber for the spray gun claimed in the '172 patent they knew they were keeping the same "formula of the area versus outlet" as used in the Probler 1 design. *Id.* at 183:21-184:3. He admitted GlasCraft used "the same diameters" and "same offset" as the Probst (which is Probler 1) in the spray gun described in the '172 patent. *Id.* at 107:15-108:4. Accordingly, Mr. Sinders knew that the design of the Probler 1 was but-material to at least claim 1 of the '172 patent.

51.    Mr. McMichael also knew that the design of the Probler 1 was material and confirmed that he was familiar with the mixing chamber design and drawings

for the Probler 1.  Mr. McMichael admitted that the initial goal of the Probler 2 project was not to make any specific changes to the Probler 1 but mainly to give the Probler 1 a new, refreshed look.  Mr. McMichael testified to his knowledge of the Probler 1 spray foam gun, including the details of its design.  He knew that the Probler 1 spray gun existed prior to his work.  McMichael Dep. Tr. at 225:4-6.  He admitted that when designing the admission passages and mixing chamber as described in the '172 patent he "probably … would have at least looked at the print or something" describing Probler 1.  *Id.* at 171:9-172:4.  He admitted that the idea for having tangential admission passages to create the swirling action described in the '172 patent was not his idea but came "from prior art."  *Id.* at 172:6-13.

## The Probler 1 Spray Foam Gun Was (And Is) But-For Material Prior Art

52.    The Probler 1 spray foam gun was material to patentability of at least one claim of the '172 Patent.

53.    Claim 1 of the '172 Patent uses Jepson style claiming which admits everything prior to the alleged improvement is known in the art.

54.    The Jepson portion of claim 1 is taught by Probler 1, including in the physical product, its product manual, and the Probst 403 patent, as is admitted by the '172 Patent.  '172 Patent at 1:63-2:42.

55.    Additionally, the Jepson portion of claim 1 is disclosed by, and nearly verbatim to, the Sinders '461 patent, which is prior art to the '172 Patent.

56.    The alleged improvement of claim 1, directed to a mixing and dispensing element, is also disclosed by the Probler 1.

57.    The Probler 1's "Chamber, Mixing" engineering drawings disclose every limitation of the claimed improvement in claim 1.

58.    The exemplary chart below demonstrates that the Probler 1 drawings were but for material to at least claim 1 of the '172 Patent:

| Claim Limitation | Material Prior Art Disclosure |
|---|---|
| 59. wherein said mixing and dispensing element comprises two-parts with |  GRACO_0054518 (Showing two distinct parts, demonstrated by different hash lines, for the mixing and dispensing element). |

| Claim Limitation | Material Prior Art Disclosure |
|---|---|
| 60. said dispensing orifice being formed in a forward part and |  GRACO_0054518. |
| 61. said cylindrical admission passages being formed in a rearward part | GRACO_0054518. |

| Claim Limitation | Material Prior Art Disclosure |
|---|---|
| 62. and with the unobstructed air purge-able cylindrical mixing chamber extending forwardly from the admission passages through the two-parts to the dispensing orifice |  GRACO_0054518. |
| 63. each of the admission passages having a cylindrical sidewall with a lesser diameter than the cylindrical sidewall of the mixing chamber | GRACO_0054518 (Showing the diameter ("dia.") of the cylindrical sidewall of each admission passage ("D") is less than the diameter of the cylindrical sidewall of each corresponding mixing chamber ("M")). |

| **Claim Limitation** | **Material Prior Art Disclosure** |
|---|---|
| 64. and each of the cylindrical sidewalls of the admission passages crossing and being tangent to the cylindrical sidewall of the mixing chamber at its intersection with the cylindrical sidewall of the mixing chamber |  |

| Claim Limitation | Material Prior Art Disclosure |
|---|---|
|  | GRACO_0054518 (showing admission passages crossing and being tangent to cylindrical sidewall of the mixing chamber).<br><br>The drawing also states that the "ANGLE OF 'D' DIA. DRILL POINT TO BE TANGENT WITH CIRCUMFERENCE OF 'M' COUNTERBORE." *Id.*<br><br> |
| 65. the sum of the cross-sectional areas of the cylindrical admission passages being substantially equal to the cross-sectional area of the dispensing orifice | <br><br>GRACO_0054518 (showing diameter of admission passages, D, and the mixing chamber diameter, M, which extends forwardly to and is the same size as the dispensing orifice). |

29

| Claim Limitation | Material Prior Art Disclosure |
|---|---|
| | Using the provided diameters to calculate area demonstrates that the sum of the cross-sectional areas of the cylindrical admission passages are substantially equal to the cross-sectional area of the dispensing orifice: |

| Sum of Cross-Sectional Areas of Admission Passages Substantially Equal To Area of Dispensing Orifice | | | | |
|---|---|---|---|---|
| Admission Passage Diameter | Sum of Areas | Spray Tip Diameter | Spray Tip Area | Percentage Difference |
| 0.036 | 0.002035752 | 0.052 | 0.002123717 | 4.229607251 |
| 0.043 | 0.002904402 | 0.062 | 0.003019071 | 3.871652082 |
| 0.052 | 0.004247433 | 0.07 | 0.003848451 | 9.856422196 |
| 0.062 | 0.006038141 | 0.089 | 0.006221139 | 2.985457108 |
| 0.071 | 0.007918384 | 0.1 | 0.007853982 | 0.816651728 |
| 0.0875 | 0.012026409 | 0.125 | 0.012271846 | 2.02020202 |
| 0.036 | 0.002035752 | 0.062 | 0.003019071 | 38.90615289 |

66.    Mr. Sinders and Mr. McMichael confirmed that the claimed dimensions in claim 1 of the '172 Patent are the same as those in Probler 1.  Mr. Sinders further explained that since the 1980s, the primary method of constructing the Probler 1 mixing and dispensing element was to manufacture two separate pieces that were fitted together.  Mr. Sinders even stated that this two-piece mixing and dispensing element construction was known outside of GlasCraft because "everybody copied the exact same thing; right?  So Gusmer did the same thing.  Everybody just welded them together."  Sinders Dep. Tr. at 245:13-246:16.  Mr. McMichael likewise confirmed that the engineering drawings provide "clarity, yeah, that [the mixing

chamber forward piece] is press-fitted into the other item to become one mixing chamber." McMichael Dep. Tr. at 67:14-19.

67.    Whether non-disclosed prior art is material to a claim is assessed under the broadest reasonable interpretation of the claim that is applied during prosecution. At least under the broadest reasonable interpretation of claim 1, the examiner would have found every limitation of the "improvement" claimed in claim 1 is disclosed by the "Chamber, Mixing" engineering drawings of the Probler 1 and the physical Probler 1 product that was on-sale and publicly available and that the entire claim 1 would be anticipated by Probler 1 or obvious in view of the '172 Patent's admission of prior art and/or U.S. Patent No. 6,796,461 to Sinders, referenced as prior art in the '172 Patent. The examiner would not have allowed at least claim 1 had this information about Probler 1 been disclosed. Accordingly, the Probler 1 is but for material to patentability.

68.    In his final rejection, the examiner found that "Pages 6 and 7 of the specification merely recite the claimed dimensions and ratios and state that they are enhanced results, however, Applicant needs to show enhanced or unexpected results by disclosing or providing evidence that other dimensions and ratios do not function nearly as well as the claimed dimensions and ratios." Sept. 17, 2008 Office Action at 7. Accordingly, the examiner found that absent a showing of the non-obvious nature of the claimed dimensions and ratios, the limitations related to dimensions

and ratios in the claimed improvement of claim 1 did not make the application patentable.  Had the examiner been provided the Probler 1 prior art drawings, the examiner would not have later allowed claim 1 as amended because the Probler 1 drawings confirm that every dimension and ratio claimed in the improvement of claim 1 was known in the prior art, in addition to a two-part assembly and the principle of tangency.

69.     The construction of the Probler 1 mix chamber and its dimensions are also non-cumulative prior art.  None of the references presented to the USPTO discussed the specific orifice sizes of mixing chambers, admission passages, and spray orifices that are disclosed by the Probler 1.  This is confirmed by Mr. Badger's statement during prosecution that "there is no disclosure in the cited references of the specific dimensions and ratios recited in claims 4-7, 8, 11, 12, 15, 16 and 19." 2008.12.15 Response to Office Action at 26.  Mr. McMichael also agreed that the Probst 403 and Sinders patents submitted to the USPTO during the '172 patent prosecution did not disclose any information about the diameters as depicted on the engineering drawings for the Probler 1 mix chamber.

### Mr. Sinders and Mr. Badger Also Made Material Misrepresentations Regarding The '172 Patent And Its Alleged Improvements

70.     Mr. Sinders made a material misrepresentation to the USPTO that the ratios and dimensions claimed in the '172 Patent provided enhanced and unexpected

results, in direct contradiction to his knowledge that the claim limitations of the '172 Patent are identical to the Probler 1.

71.     In his statement to the USPTO, Mr. Sinders acknowledged that "[t]he Examiner has requested a showing of the enhanced or unexpected results achieved with certain claim dimensions and ratios in the Applicant's invention." *Id.* ¶ 10.

72.     Mr. Sinders understood that a showing of enhanced or unexpected results was requested by the patent examiner in order to issue the patent, and therefore his responsive statements would be material to the examiner's decision on patentability.

73.     Mr. Sinders further stated that he reviewed the examiners rejection, demonstrating that he knew that his statements were material to patentability.

74.     In response to the examiner's request, Mr. Sinders made the following statements and representations to the USPTO about "unexpected or enhanced results achieved with the certain claimed dimension and ratios":

- "Because of the small size and the important functions to be provided by the mixing and spraying element, the specific dimensions and ratios of the mixing and dispensing element are essential to the preferred embodiments of the invention."

- "[I]t is essential in achieving the effective mixing of the plural component materials that the cylindrical sidewalls of the admission passages have small and preferably equal diameters and are tangent with the cylindrical sidewall mixing chamber where they intersect and that the sum of the cross-sectional areas of the admission passages be substantially equal to the cross-sectional area of the dispensing orifice in achieving the free and rapid flow of plural component materials from the admission passages without back-pressure …"

- "It is also essential in preferred embodiments that the relative diameters of the cylindrical mixing chamber and the admission passages be such that each of the plural component materials leaving the admission passages flows rapidly into the mixing chamber with minimal resistance … for example, that the diameter of the mixing chamber, where intersected by the admission passages be about 1.6 times the diameter of the admission passages, and that the offsets of the admission passages be about .011 to about .013 inches."

- "With the pressures available for pumps used in pumping the isocyanate and curing agent components, the diameters and ratios set forth above provide and maintain a rapid whirling flow of the components throughout the length of the mixing chamber to the dispensing orifice so that upon leaving the dispensing orifice the resultant forces form the liquid components into spray particles of usable size and distribute those spray particles in a wide uniform pattern so that workman may apply the mixed plural component materials in a uniform layer by direction of the apparatus."

- "One example of a preferred embodiment of the invention, as described at page 7 of the patent application, includes admission passages for the plural components with diameters of about 0.043 inches, where the diameter of the mixing chamber where the admission passages intersect the mixing chamber is about 0.069 inches, the offset between the central axes of the admission passages is about 0.011 inches, and the diameter of the dispensing orifice at the [sic] of the mixing and spraying element is about 0.60 inches."

2008.12.15 Declaration of Steven Sinders ¶ 10.

75.     Despite telling the USPTO that each of the above statements was an "unexpected or enhanced results achieved with the certain claimed dimension and ratios," Mr. Sinders admitted during his deposition that he knew each dimension and ratio was already known and used in the Probler 1 which correlates to the prior art Probst patent.  Sinders Tr. at 107:15-108:4 ("Q.  Were you ever involved in testing or drilling or designing the admission passages and where they should be drilled into a mixing chamber?  A.  We would use the same diameters.  We would use the same

34

offset as Probst.  Q.  Okay.  And that would have been something that you just carried through?  That was a constant at GlasCraft to keep these principles of offsets and diameters?  A.  I think everybody did.  Gusmer, Graco.  They all used the same – Probst – down to the val (ph) [thousandth] of the diameters."); 201:15-202:4 ("Q. So the question is, in Exhibit 11, which is the McMichael patent, in the last four lines of Claim 1, it states the sum of the cross sectional areas of the cylindrical admission passages being substantially equal to the cross-sectional area of the dispensing orifice.  A.  Okay.  Q.  Did I read that correctly?  A.  You did.  Q.  Was this the same relationship that was already used in the Probst patent?  A.  Correct."), 183:21-184:3 ("Q.  Is there a desire to remain consistent with what was already working in the Probler P1?  A.  Well, we knew we were going to take that formula of the area versus outlet.  That was the only thing that had to stay; right?").

76.    Mr. Sinders misrepresented to the USPTO that the claimed dimensions and relationships provided an unexpected or enhanced result.

77.    Mr. Sinders testified that he did not write, and was skeptical of, the statements in the declaration that he signed, further demonstrating that he knowingly signed off on misrepresentations to the USPTO.  Sinders Dep. Tr. at 95:3-7 ("Q. Just to start with, do you agree – we'll just start with whether or not you agree with this statement.  A.  I do not know who this guy is.  I'm not sure who or what he's representing.  So –"), 96:22-97:4 ("Q.  Was this something that you wrote?  A.  I

35

would say that this is my opinion.  Q.  So you – this was not written by you, but it is your opinion?  A.  Correct."), 97:12-14 ("Q.  did you work with attorneys on this document?  A.  Yes."), 97:20-98:18 ("Q.  The second sentence.  Because of the viscosity and surface tension of the liquid materials that must be mixed in the applicant's invention, the liquid materials resist mixing and must be injected into the mixing chamber through small diameter mixing passages to provide small diameter streams with high velocities, and with the same small diameter high velocity mixing streams entering the mixing chamber tangent to its walls, so a rapid whirling movement is imparted to the liquid materials to effect their mixing.  Did I read that correctly?  A.  That's exactly what it says.  Q.  Do you agree with that statement?  A.  I don't know why that would have – the velocity and the surface tension.  Q.  So you think there's a problem with that statement?  A.  I don't know that there's a problem with it, but it doesn't sound like anything I would have put into it.").

78.    Mr. Sinders stated as a fact in his declaration to the PTO that a "rapid whirling movement" was one of the unexpected results that was accomplished by the tangential nature of the admission passages entering the mixing chamber, yet Mr. Sinders knew that this principle was disclosed by the Probler 1 spray foam gun, as he admitted in his deposition.

79.    Mr. Sinders again knowingly misled the USPTO with information he knew to be material to patentability because it was requested by the examiner to allow the patent.

80.    Likewise, Mr. Badger made material misrepresentations to the USPTO regarding the ratios and dimensions claimed in claim 1 of the '172 Patent.  In his December 15, 2008 Response to Office Action, Mr. Badger responds to the examiner's statement that the dimensions and size ratios claimed in the invention are obvious and states "there is no disclosure in the cited references of the specific dimensions and ratios recited in claims 4-7, 8, 11, 12, 15, 16 and 19, and as set forth in Sinders' Declaration paragraph 10, the specific dimensions and ratios are essential in preferred embodiments of the invention and its enhanced operation."  2008.12.15 Response to Office Action.  Mr. Badger's statement that the "specific dimensions and ratios are essential in preferred embodiments of the invention and its enhanced operation" was material to patentability as it misstated as fact that the claimed dimensions provided enhanced operation and results, even though the same principles were used in the prior art.

81.    On information and belief, Mr. Badger knew that the sizes and ratios claimed in the '172 Patent, including those ratios in amended claim 1 that Mr. Sinders misrepresented to the USPTO as providing unexpected and improved results, were not new and non-obvious.  Mr. Badger further knew that these

37

dimensions and ratios did not provide any enhanced operation over the Probler 1's disclosure of the same dimensions and ratios. These dimensions and ratios were known since the 1970s and were each carried over from the Probler 1 and Probst 403 patent that Mr. Badger was familiar with.

**Prosecuting Attorney Dave Badger In Conjunction With At Least Named Inventor Jonathan McMichael And Head Of Research And Development Steve Sinders Acted With The Specific Intent To Deceive The USPTO By Failing To Disclose The Probler 1 And Materially Misleading The USPTO As To The Non-Obviousness Of The Invention**

82.    Messrs. Sinders and McMichael in conjunction with at least Mr. Badger acted with the specific intent to deceive the USPTO by not disclosing the Probler 1 or any accompanying documentation for it, and by submitting material misrepresentations to the USPTO. At least Messrs. Sinders, McMichael, and Badger knew of the Probler 1, and they knew it was material as exemplified above. Further, by not disclosing any details regarding the design or dimensions of the Probler 1, they made a deliberate decision to withhold the reference despite knowing its relevance and misleading the USPTO that alleged improvements copied from the Probler 1 were new.

83.    Messrs. Sinders, McMichael, and Badger knew that the USPTO issued a final rejection with respect to the '172 Patent and was skeptical that the claimed "improvements" were non-obvious additions to the prior art. Thus, Messrs. Sinders, McMichael, and Badger knew that if they disclosed the Probler 1's design and

dimensions, which the claimed "improvements" in amended claim 1 were copied from, the patent would not be allowable.  Messrs. Sinders, McMichael, and Badger also knew that since the Probst '403 patent expired, competitors were introducing products similar to GlasCraft's Probler 1 design and cutting into its sales.  They were also aware that competitors were threatening GlasCraft with patent infringement suits for the Probler 2 design.   On information and belief, Messrs. Sinders, McMichael, and Badger were highly motivated to secure patent protection related to the Probler 2 and intentionally elected to withhold information related to the Probler 1, and to mislead the USPTO, in order to secure issuance of the patent.

84.     Further, on information and belief, Mr. Sinders intentionally made material misrepresentations to the USPTO regarding whether certain limitations claimed in the '172 Patent were non-obvious and provided unexpected or improved results because he knew that Mr. Badger needed such misrepresentations in order to secure issuance of the patent, and he did not question what Mr. Badger requests.

## COUNT VI

### *WALKER PROCESS* ANTITRUST VIOLATION: ATTEMPTED MONOPOLIZATION
### 15 U.S.C. §§ 2, 15(A), AND 26

85.     Carlisle repeats and re-alleges paragraphs 1-84 as if fully set forth herein.

86.    As recounted above, ¶¶ 34-84, during prosecution of the '172 patent, Graco and Messrs. Sinders, McMichael, and Badger intentionally failed to disclose and withheld material information describing the Probler 1 with the purpose of deceiving the patent examiner.  The patent examiner relied on Graco's, and Messrs. Sinders's, McMichael's, and Badger's representations in granting the patent. Further, had Graco and these individuals not withheld this information, the USPTO would not have issued the '172 patent.  Graco therefore "obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement."  *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 266 (3d Cir. 2017).

87.    Graco's fraud on the USPTO, its assertion against Carlisle of the patent obtained by fraud, and its threats of patent-related litigation against various distributors is anticompetitive conduct designed to monopolize in violation of the Sherman Act, 15 U.S.C. § 2.  *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

88.    Through its fraud and litigation-related conduct, Graco has engaged in predatory and anticompetitive conduct with a specific intent to monopolize the market for fast-set equipment and the submarket for plural component spray guns.

89.    Graco is asserting the '172 patent against Carlisle's plural component spray guns.  The plural component spray guns at issue are used to mix and to dispense polyurethane foams and polyurea coatings, and these spray guns are part of the fast-set equipment market.  Fast-set equipment combines and applies reactive chemicals that form polyurethane foams or polyurea coatings and are used for such applications as to spray polyurethane foams to insulate buildings.

90.    Fast-set equipment is not reasonably interchangeable with or substitutable for other technologies.  And plural component spray guns are a recognized submarket within the market for fast-set equipment.  Producers in both markets compete in the U.S. and, in the alternative, in North America.

91.    There are significant barriers to entering the alleged markets, including Graco's exclusionary and fraudulently obtained '172 patent, capital costs, and technological obstacles.

92.    Graco has long held dominant market share in the U.S. and North American markets for fast-set equipment and plural component spray guns, and it has used lawsuits to maintain that market share.  Graco obtained its dominant market share by pursuing a strategy of acquiring its competitors in the manufacture and sale of fast-set equipment.  Graco acquired Gusmer and GlasCraft, which was the original assignee of the patent application that issued as the '172 patent.  In 2013, the FTC sued Graco for violating Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section

41

5 of the Federal Trade Commission Act, 15 U.S.C. § 45, when it acquired those competitors. The FTC determined that there was a product market for the manufacture and sale of fast-set equipment for use by contractors and a geographic market of North America. *See* Compl., *In re Graco Inc.*, FTC Docket No. C-4399 (Apr. 17, 2013) (available at https://bit.ly/3Akxdhm).

93. The FTC concluded that Graco at that time had acquired 90% or more of the share of the North American fast-set equipment market by acquiring Gusmer and GlasCraft, its two "closest competitors in the relevant market." *Id.* ¶ 4. Those acquisitions "led to higher prices and fewer choices, and enabled Graco to raise barriers to entry that inhibited entry and expansion by potential competitors." *Id.* ¶ 5. The FTC further determined that after the acquisitions, Graco employed "several strategies" to reduce new entrants' access to distribution resources, including by "raising distributors' discount and inventory thresholds, thereby reducing distributors' ability to carry the products of new entrants, and [by] threatening distributors with termination or other retaliation should they agree to carry the products of competing manufacturers." *Id.* ¶ 9.

94. Graco entered into a Consent Agreement to resolve the FTC's complaint. The Consent Agreement required Graco to license certain technology to one competitor and prohibited it from continuing to engage in certain anticompetitive actions to interfere with access to distributors. *See* FTC, *Graco, Inc.*

*Settles FTC Charges That Its Acquisitions Illegally Harmed Competition in the U.S. Market for Fast Set Equipment* (Apr. 18, 2013) (available at https://bit.ly/41pRiP4).

95.    On information and belief, Graco continues to dominate the market for fast-set equipment and the submarket for plural component guns.  In particular, it currently has a more than 75% share of the U.S. market for plural component guns, and it has a similar share of the North American market for plural component guns, and the U.S. and North American markets for fast-set equipment generally.

96.    Carlisle is a new competitor of Graco's in the market for fast-set equipment and the submarket for plural component spray guns.  Already Graco has taken anticompetitive action against Carlisle by filing this lawsuit.  And it has continued its practice of threatening distributors by informing them of this lawsuit and threatening them with patent-related litigation, presumably in an effort to prevent them from helping Carlisle to compete with Graco and threaten its market dominance.

97.    Graco's anticompetitive conduct, including its fraud on the USPTO, its assertion against Carlisle of the patent obtained by fraud, and its threats of patent-related litigation against various distributors, is designed to create a barrier to entry and to monopolize the U.S. and North American market for fast-set equipment generally and the submarket for plural component spray guns specifically by preventing Carlisle and others from competing with Graco.

43

98.    Graco possessed sufficient market power to come dangerously close to success in achieving monopolization of the U.S. and North American markets for fast-set equipment and plural component spray guns.

99.    Graco's anticompetitive conduct has caused harm to the competitive process in the fast-set equipment and plural component gun markets in the U.S. and North America.  And it has caused harm and continues to cause harm specifically to Carlisle's business, including by causing it to suffer lost profits and requiring Carlisle to expend substantial amounts of money, time, and human resources to defend against Graco's fraudulently obtained patent.

100.    Graco therefore has violated Section 2 of the Sherman Act.

## COUNT VII

### *WALKER PROCESS* ANTITRUST VIOLATION: MONOPOLIZATION 15 U.S.C. §§ 2, 15(A), AND 26

101.    Carlisle repeats and re-alleges paragraphs 1-100 as if fully set forth herein.

102.    As recounted above, ¶¶ 34-84, during prosecution of the '172 patent, Graco and Messrs. Sinders, McMichael, and Badger intentionally failed to disclose and withheld material information describing the Probler 1 with the purpose of deceiving the patent examiner.  The patent examiner relied on Graco's, and Messrs. Sinders's, McMichael's, and Badger's representations in granting the patent. Further, had Graco and these individuals not withheld this information, the USPTO would not have issued the '172 patent.  Graco therefore "obtained the patent by

44

knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement." *TransWeb*, 812 F.3d at 1306; *see also In re Lipitor Antitrust Litig.*, 868 F.3d at 266.

103.    Graco's fraud on the USPTO, its assertion against Carlisle of the patent obtained by fraud, and its threats of patent-related litigation against various distributors is anticompetitive conduct designed to monopolize in violation of the Sherman Act, 15 U.S.C. § 2. *See Walker Process*, 382 U.S. 172.

104.    As discussed above, Graco has long held a dominant market share in the U.S. and North American markets for fast-set equipment and plural component spray guns.  On information and belief, Graco currently has a more than 75% market share of those markets.

105.    Fast-set equipment is not reasonably interchangeable with or substitutable for other technologies.  And plural component spray guns are a recognized submarket within the market for fast-set equipment.  Producers in both markets compete in the U.S. and, in the alternative, in North America.

106.    There are significant barriers to entering the alleged markets, including Graco's exclusionary and fraudulently obtained '172 patent, capital costs, and technological obstacles.

107.    In light of Graco's anticompetitive conduct and dominant market share, Graco currently possesses monopoly power in the U.S. and North American markets for fast-set equipment and plural component spray guns.

108.    Graco has willfully acquired that monopoly power by engaging in anticompetitive conduct, including by committing fraud on the USPTO, by enforcing its '172 patent against its competitors, including Carlisle, and by threatening patent-related litigation against distributors.

109.    Graco's anticompetitive conduct has caused harm to the competitive process in the fast-set equipment and plural component gun markets in the U.S. and North America.  And it has caused harm and continues to cause harm specifically to Carlisle's business, including by causing it to suffer lost profits and requiring Carlisle to expend substantial amounts of money, time, and human resources to defend against Graco's fraudulently obtained patent.

110.    Graco therefore has violated Section 2 of the Sherman Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Carlisle requests the following judgments and relief against Graco:

(i)     That all claims against Carlisle be dismissed with prejudice and that all relief requested by Graco be denied;

(ii)    That a judgment be entered declaring that Carlisle has not infringed and does not infringe any valid and enforceable claim of the '172 patent, either literally or under the doctrine of equivalents;

(iii)    That a judgment be entered declaring that the claims of the '172 patent are invalid and/or unenforceable for failure to comply with the statutory provisions of Title 35 of the United States Code, including without limitation, one or more sections 102, 103, and/or 112;

(iv)    That a judgment be entered declaring that the '172 patent is unenforceable due to inequitable conduct during prosecution;

(v)    That a judgment be entered declaring that this case is exceptional under 35 U.S.C. § 285, and accordingly that Carlisle is entitled to recover reasonable attorneys' fees and costs upon prevailing in this action;

(vi)    That a judgment be entered that Graco has violated the Sherman Act, 15 U.S.C. § 2, and that Carlisle be awarded treble damages for all antitrust injuries, including legal fees incurred in this lawsuit and lost profits;

(vii)    That Graco be permanently enjoined from monopolizing or attempting to monopolize the relevant product and geographic markets; and

(viii)    That Carlisle be awarded such other relief that the Court deems just and equitable, or which the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Gregg F. LoCascio, P.C.
Nathan S. Mammen
Nichole DeJulio
Karthik Ravishankar
Cole  T. Tipton
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 389-5000

*Attorneys for Defendant*

June 8, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 8, 2023, upon the following in the manner indicated:

Nitika Gupta Fiorella, Esquire                              *VIA ELECTRONIC MAIL*
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

Joseph A. Herriges, Esquire                              *VIA ELECTRONIC MAIL*
Conrad A. Gosen, Esquire
Sarah E. Jack, Esquire
Brandon J. Pakkebier, Esquire
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
*Attorneys for Plaintiffs*

/s/ *Anthony D. Raucci*
_____
Anthony D. Raucci (#5948)