## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GRACO INC. and GRACO MINNESOTA INC., | |
| Plaintiffs, | C.A. No. 21-245-JLH-SRF |
| v. | **REDACTED –** |
| CARLISLE CONSTRUCTION MATERIALS, LLC, | **PUBLIC VERSION** |
| Defendant. | (Filed July 9, 2024) |
| CARLISLE CONSTRUCTION MATERIALS, LLC, and CARLISLE COMPANIES, INC., | |
| Counterclaim Plaintiffs, | |
| v. | |
| GRACO INC. and GRACO MINNESOTA INC., | |
| Counterclaim Defendants. | |

## GRACO'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON CARLISLE'S *WALKER PROCESS* ANTITRUST COUNTERCLAIMS

M. Sean Royall (admitted *pro hac vice*)
Brent P. Ray (admitted *pro hac vice*)
Abby L. Parsons (admitted *pro hac vice*)
Emily S. Newton (admitted *pro hac vice*)
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
Tel: (202) 626-2994
sroyall@kslaw.com
bray@kslaw.com
aparsons@kslaw.com
enewton@kslaw.com

Pilar G. Kraman (#5199)
Colin A. Keith (#7074)
Jennifer P. Siew (#7114)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square, 1000 N. King St.
Wilmington, DE 19801
(302) 576-3586
pkraman@ycst.com
ckeith@ycst.com
jsiew@ycst.com

*Attorneys for Plaintiffs/Counterclaim Defendants*
*Graco Inc. and Graco Minnesota Inc.*

**Dated: June 21, 2024**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

LEGAL STANDARD ............................................................................................ 6

ARGUMENT ......................................................................................................... 7

    I.   Carlisle Cannot Prove That Graco's Patent Enforcement Has Created a Plausible Threat of Monopolization............................................................................................. 8

        A.  Graco Lacks Monopoly Power Because, as Carlisle and Its Expert Concede, It Is "Constrained" by "Formidable" Competition. .............................................. 8

        B.  Carlisle Undisputedly Has Not Been Excluded from the Market by Graco's Patent Enforcement, and There Is No Plausible Threat of Future Exclusion........................ 15

            1.  The '172 Patent Has Not Excluded Competition................................................. 16

            2.  The '172 Patent Creates No Plausible Risk of Future Exclusion. ........................ 19

   II.  Carlisle Cannot Prove That Graco's Patent Enforcement Has Harmed Competition....... 20

        A.  Carlisle's Individual Litigation Expenses Are Not Antitrust Injury Absent Broader Harm to Competition.................................................................................... 21

        B.  Carlisle's Individual Economic Harms Are Not Antitrust Injury, and There Is No Plausible Risk of Future Antitrust Injury.................................................. 24

CONCLUSION...................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agrashell, Inc. v. Hammons Prods. Co.*,
   479 F.2d 269 (8th Cir. 1973) .................................................26

*Atl. Richfield Co. v. USA Petrol. Co.*,
   495 U.S. 328 (1990).................................................................23, 24

*Augustine Med., Inc. v. Mallinckrodt, Inc.*,
   2003 WL 1873836 (D. Del. Apr. 9, 2003).............................10, 23

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ...................................................10

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2022) ...............................................14

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) .................................................11

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ...................................................14

*Bourns, Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003) ...................................................20

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)...............................................8, 10, 15, 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..................................................................24

*California Eastern Laboratories, Inc. v. Gould*,
   896 F.2d 400 (9th Cir. 1990) ...................................................20

*Carpenter Tech. Corp. v. Allegheny Techs., Inc.*,
   2011 WL 4528303 (E.D. P.A. Sept. 30, 2011) ......................3, 14

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
   2006 WL 13058 (N.D. Cal. Jan. 3, 2006)................................22

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
   114 F.3d 1547 (Fed. Cir. 1997), *abrogated on other grounds by Cybor Corp.*
   *v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) .............22

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001)............................................................................................24

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016)..................................................................................... *passim*

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd in part on other grounds*,
  67 F.4th 946 (9th Cir. 2023) ........................................................................................13

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) .............................................................16, 18, 19, 26

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)......................................................................................................10

*FTC v. Walmart Inc.*,
  664 F. Supp. 3d 808 (N.D. Ill. 2023) ............................................................................12

*Garnica v. HomeTeam Pest Def., Inc.*,
  230 F. Supp. 3d 1155 (N.D. Cal. 2017) ........................................................................14

*GlobalTap LLC v. Smart Tap LLC*,
  2015 WL 791256 (N.D. Ill. Feb. 24, 2015) .............................................................22, 23

*In re Google Digital Advertising Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022)........................................................................11, 27

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ................................................................................18, 24, 25

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
  2016 WL 10706086 (N.D. Ind. Oct. 28, 2016)..............................................................12

*Henson v. Turn, Inc.*,
  2018 WL 6605624 (N.D. Cal. Dec. 17, 2018)................................................................12

*In re Humira (Adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020) ............................................................................25

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
  351 F. Supp. 3d 1187 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020) ........................14

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
  962 F.3d 1015 (8th Cir. 2020) .....................................................................................9

*Lans v. Digital Equip. Corp.*,
  252 F.3d 1320 (Fed. Cir. 2001)....................................................................................19

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) ........................................................25

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ..................................................25

*In re Loestrin 24 Fe Antitrust Litig.*,
433 F. Supp. 3d 274 (D.R.I. 2019)..................................................11

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
801 F.3d 1150 (9th Cir. 2015) .......................................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................25

*MLB Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)..............................................................7

*Multimedia Patent Tr. v. Apple Inc.*,
2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) .............................13

*N.J. Turnpike Auth. v. PPG Indus., Inc.*,
16 F. Supp. 2d 460 (D.N.J. 1998) ................................................12

*Ngethpharat v. State Farm Fire & Casualty Co.*,
2021 WL 2823245 (W.D. Wash. July 7, 2021) ............................13

*NRT Technology Corp. v. Everi Holdings Inc.*,
2020 WL 3403091 (D. Del. June 19, 2020)..........................4, 6, 22, 23

*OJ Commerce, LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022) ..............................................17, 19

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*,
187 F. Supp. 3d 483 (D.N.J. 2016) ........................................22, 23, 24

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018)....................................................24, 25

*Premier Comp Sols. LLC v. UPMC*,
377 F. Supp. 3d 506 (W.D. Pa. 2019)..............................15, 16, 25, 26

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) ..............................................26, 27

*Quasebarth v. Green Tree Servicing, LLC*,
2016 WL 427087 (M.D. Ga. Feb. 3, 2016)...................................12

iv

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ..................................................................2, 7, 21

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
  392 F. Supp. 2d 118 ..........................................................................10, 16, 23

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
  96 F.4th 327 (2d Cir. 2024) ..........................................................................17

*Richter Concrete Corp. v. Hilltop Concrete Corp.*,
  691 F.2d 818 (6th Cir. 1982) ...........................................................................9

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
  700 F.3d 503 (Fed. Cir. 2012) ..........................................................................8

*Sandoz Inc. v. United Therapeutics Corp.*,
  2022 WL 17335696 (D.N.J. Mar. 30, 2022) .......................................16, 18, 26

*Siegler v. Sorrento Therapeutics, Inc.*,
  2019 WL 581719 (S.D. Cal. Feb. 13, 2019) .............................................25, 26

*Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*,
  133 F.3d 103 (1st Cir. 1997) ............................................................................9

*Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*,
  2019 WL 1082067 (D. Del. Mar. 7, 2019) ............................................. *passim*

*Steak Umm Co. v. Steak 'Em Up, Inc.*,
  868 F. Supp. 2d 415 (E.D. Pa. 2012) .............................................................13

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
  656 F.3d 112 (1st Cir. 2011) ..........................................................................21

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
  724 F. Supp. 2d 245 (D.P.R. 2010), *aff'd*, 656 F.3d 112 (1st Cir. 2011) ...............25

*Suture Exp., Inc. v. Owens & Minor Distrib., Inc.*,
  851 F.3d 1029 (10th Cir. 2017) .............................................9, 11, 15, 16

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ..............................................................................15

*TransWeb, LLC v. 3M Innovative Props.*,
  812 F.3d 1295 (Fed. Cir. 2016) .................................................................. *passim*

*United States v. E. I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) ........................................................................................12

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
   375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006)......2, 23, 26, 27

*W. Parcel Exp. v. UPS of Am.*,
   190 F.3d 974 (9th Cir. 1999) ............................................................................................11, 15

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*,
   2015 WL 832306 (N.D. Ill. Feb. 24, 2015) ................................................... *passim*

*Wing Enters., Inc. v. Tricam Indus., Inc.*,
   829 F. App'x 508 (Fed. Cir. 2020) ........................................................................................13

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...................................................................................................23

**Statutes**

15 U.S.C. § 2, Sherman Act............................................................................................ *passim*

**Other Authorities & Sources**

Federal Rule of Civil Procedure 56 .................................................................................. 6-7

U.S. Patent No. 7,527,172........................................................................................... *passim*

## **INTRODUCTION**

In *Walker Process*, the Supreme Court held that enforcement of a fraudulently procured patent can lead to antitrust liability where it creates genuine monopolization concerns and all elements of a Sherman Act Section 2 claim are satisfied. That is manifestly ***not*** the case here.

To support any Section 2 claim, Carlisle must prove that Graco's challenged patent conduct plausibly threatens to substantially exclude competition, leaving Graco with monopoly control over the marketplace. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402-03 (3d Cir. 2016); *see, e.g.*, *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2015 WL 832306, at \*5 (N.D. Ill. Feb. 24, 2015) (*Walker Process* requires "evidence sufficient to allow a reasonable jury to find that [the defendant] used the [disputed] patent to dominate the market and drive all or most substitutes from it" (cleaned up)). No record facts support this. It is undisputed that Carlisle has not been excluded from the market, nor has any other competitor been threatened with exclusion. Its own expert admits that Carlisle has emerged as a successful, fierce competitor to Graco and, together with other competitors, "constrains" Graco in the marketplace. Carlisle points to some alleged lost sales stemming from the patent dispute and arguable delays in obtaining distribution, but even assuming such allegations could be proven at trial, these are at most marginal business interruptions. They have not kept Carlisle from becoming Graco's "closest" and most "formidable" competitor, nor have the costs of defending Graco's patent infringement suit meaningfully impaired Carlisle's ability to compete. Notwithstanding its patent enforcement activities, Graco faces substantial competition from Carlisle and others. By Carlisle's own admission, Graco has no monopoly, nor is there any plausible risk that Graco, by enforcing its patent rights, will ever acquire monopoly power.

The only scenario Carlisle has put forth for how it could possibly be excluded from the market, theoretically enabling a Graco monopoly, hinges on the potential for Carlisle's ST1 spray gun to be barred through a future patent injunction in this case. But this theory is not plausible, as the patent in question—U.S. Patent No. 7,527,172 ("'172 patent")—expires on November 15, 2024, before the case is set for trial. Consequently, there will never be any injunction, and there is no possible future in which Graco's patent enforcement could result in the substantial exclusion of competition. *See Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, 2019 WL 1082067, at *6 (D. Del. Mar. 7, 2019) (dismissing *Walker Process* claim where, due to patent's expiration, "even if [p]laintiff is successful, there is no chance that [d]efendants will be barred from . . . the market").

The same basic points prevent Carlisle from proving antitrust injury, another essential element of any private antitrust claim. Antitrust injury requires "harm to competition"—*i.e.*, substantial harm to the competitive process across the market as a whole, "not just harm to the plaintiff competitor." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010); *see Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1362 (Fed. Cir. 2004) (stressing that a *Walker Process* plaintiff must prove "more than simply that the defendant's wrongful behavior directly damaged the plaintiff's business, but also that the accused behavior stifled [market-wide] competition"), *rev'd on other grounds*, 546 U.S. 394 (2006). No such competitive harm exists here. If Carlisle were realistically threatened with being excluded from the market due to Graco's actions *and* Carlisle could prove all other elements of antitrust liability, then the fees it paid to defend Graco's infringement suit might be recoverable as antitrust damages. *TransWeb, LLC v. 3M Innovative Props.*, 812 F.3d 1295, 1309-11 (Fed. Cir. 2016). But those fees, just like Carlisle's alleged lost sales and temporary delays in obtaining distribution, do not amount to antitrust injury in themselves—not where, as here, the *Walker Process* plaintiff was never

2

excluded from the market or plausibly threatened with exclusion, and there has been no material loss of competition in the market as a whole.

*Walker Process* claims demand specific proof, and summary judgment is required when that proof is lacking. *See, e.g.*, *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, 2011 WL 4528303, at \*12 (E.D. P.A. Sept. 30, 2011) (granting summary judgment where, as here, *Walker Process* plaintiff failed to produce sufficient evidence of monopoly power); *Weber-Stephen*, 2015 WL 832306, at \*6 (granting summary judgment where, as here, *Walker Process* plaintiff "was never excluded from the relevant market" and, "in spite of [patent] litigation," the market remained "extremely competitive"). Although Graco continues to maintain that Carlisle has failed to plead a viable Section 2 claim, justifying judgment on the pleadings under Rule 12(c), Graco is alternatively entitled to summary judgment under Rule 56 for the reasons stated below.

## BACKGROUND

Graco initiated its patent suit in February 2021. In June 2023, the Court allowed Carlisle to amend its answer to add an inequitable conduct defense and *Walker Process* counterclaims. D.I. 145. In March 2024, the undersigned counsel replaced Graco's prior counsel, and less than six weeks later filed a Rule 12(c) motion seeking judgment as a matter law on Carlisle's *Walker Process* counterclaims. D.I. 282, 303. In opposing Graco's motion, Carlisle proposed to further amend its pleadings, arguing such amendments would cure any deficiencies—a proposition with which Graco strongly disagrees. D.I. 305 ("12(c) Opp.") at 18-19; D.I. 309 ("12(c) Reply") at 10.

Carlisle's opposition also elaborated in detail on the specific nature of its antitrust claims and contentions. According to Carlisle, Graco once possessed monopoly power in the asserted relevant markets, yet Carlisle effectively concedes this is no longer the case. While Graco "***once controlled*** [the market] with a 90% share," Carlisle claims its recent entry "introduce[d] *more*

competition into the market," causing Graco to "lose market share." 12(c) Opp. 11, 19 (bolded emphasis added); *see also id.* at 1, 11 (suggesting Graco "previously" had "a 90% share," but that since Carlisle's entry Graco's share has fallen). Carlisle maintains that its entry has brought "major competition" into the marketplace and that it has emerged as Graco's "largest competitor," "most significant competitor," and "only real competitor." *Id.* at 2, 9, 19. Carlisle also touts how closely Graco and Carlisle compete on spray gun pricing. *See id.* at 19 n.6.

Given the "major competition" Graco now faces and how aggressively Carlisle has been targeting Graco to win market share, Carlisle appears to acknowledge it cannot plead or prove that "the market as a whole" has to date "suffered injury as a result of [Graco's] infringement case." 12(c) Opp. 6. Instead, relying on *TransWeb* and *NRT Technology Corp. v. Everi Holdings Inc.*, 2020 WL 3403091 (D. Del. June 19, 2020), Carlisle asks the Court to excuse it of any obligation to provide such proof, contending that the mere fact it has incurred legal fees defending Graco's patent suit is "*per se* adequate" to establish "harm to competition." 12(c) Opp. 6, 7; *see also id.* at 1 ("a party that must spend money to defend against an infringement suit based on [an allegedly] fraudulent patent . . . has automatic antitrust injury"); *id.* at 6 (incurring fees "alone is sufficient"); *id.* at 12 ("anticompetitive harm is *per se* established" by Carlisle's "patent-defense costs").

However, Carlisle asserts it does have a basis to plead and prove potential ***future*** harm to competition. Carlisle argues that "Graco's infringement complaint seeks to exclude Carlisle's spray-foam gun from the market through an injunction." 12(c) Opp. 3. According to Carlisle, ***if*** Graco succeeded in obtaining an injunction, ***then*** Carlisle's ST1 spray gun *would be* excluded from the market, which in turn *would* harm competition. This "*if-then*" argument suffuses Carlisle's 12(c) opposition. *See id.* at 10 ("If Graco succeeds [with] . . . its requested injunction, it will drive Carlisle's ST1 gun from the market."); *id.* at 14 ("if Graco wins the injunction it seeks,

Carlisle would be forced to exit the market"); *id.* at 9 (an injunction that "exclude[s] one's largest competitor plainly 'lessens' competition"); *id.* at 13 ("If Graco [by injunction] excludes . . . a competing spray foam gun . . . , that would . . . 'lessen' competition within the market.").

Carlisle's economic expert, Dr. Divya Mathur, says the same thing: "that excluding Carlisle from the market" through an injunction "would harm competition." 12(c) Opp. 18; *see* Ex. 9, Mathur Report ¶ 104 ("If successful, Graco's alleged scheme to exclude Carlisle from the Spray Gun market would . . . harm consumers"); Ex. 11, Mathur Reply ¶ 51 ("Excluding Carlisle via injunction . . . would harm competition").[1] Yet Dr. Mathur, in her reports and deposition testimony, has readily acknowledged that Carlisle has ***not*** been excluded in any meaningful sense to date. Her reports both emphasize that Carlisle is "Graco's ***most formidable*** Spray Gun competitor," and that "Carlisle's presence in the marketplace"—along with that of another "major manufacturer, PMC"—has materially "***constrained***" Graco. Ex. 9, Mathur Report ¶ 106 (emphasis added); Ex. 11, Mathur Reply at 30 n.111. Dr. Mathur likewise stresses the close degree of price competition between Graco and Carlisle. *See* Ex. 12, Mathur Dep. Tr. at 150:11-15 ("the pricing points of the spray guns that are offered and sold by other competitors in the marketplace also indicate that Carlisle and Graco compete closer head-to-head in terms of price points than the other manufacturers"). Through intense competition with Graco, Dr. Mathur admits Carlisle "has gained meaningful [market] share" of its own. Ex. 12, Mathur Dep. Tr. at 67:1.

Thus, notwithstanding Graco's challenged patent enforcement activities, Dr. Mathur agrees that Carlisle has successfully become a "formidable" and "meaningful competitor to Graco," and that Carlisle's products are a "meaningful competitive threat and constraint to Graco." Ex. 12, Mathur. Dep. Tr. at 153:4-7, 14-15; *see also id.* at 154:11-12 ("Carlisle's presence in the market is

---

[1] All Exhibits are attached to the Declaration of M. Sean Royall, filed concurrently with this brief.

providing a competitive threat to Graco"); *id.* at 155:10-11 (Carlisle "has succeeded in increasing its share of the market" at Graco's expense); *id.* at 156:7-15 ("notwithstanding the patent-related conduct that Carlisle is challenging, . . . to date that conduct has not prevented Carlisle from being a formidable and meaningful competitor to Graco").

Thus, the situation here is as follows: Carlisle openly acknowledges Graco faces substantial competition, and hence lacks monopoly power. It similarly admits it has not been excluded from the market, nor has any other competitor. Carlisle attempts to overcome these admissions by contending that the Court should simply disregard these facts and treat its legal fees as "*per se* adequate" to establish "harm to competition." 12(c) Opp. 6—an argument with no legal support. Short of that, Carlisle argues that the prospect of a *future* patent injunction barring its spray gun from the market cures the many deficiencies in its proof, because such an injunction would "allow Graco" to once again "dominate the relevant market." *Id.* at 13, 18.

For the reasons explained below, none of these arguments is sufficient to avert summary judgment. Carlisle has no proof to satisfy the core elements of Sherman Act liability, and the mere fact that Graco's prayer for relief referenced a possible injunction does not alter that. In *NRT*, this Court concluded it was "***plausible*** that the market as a whole would have suffered injury" had Everi won its patent suit, obtaining an injunction. *NRT*, 2020 WL 3403091, at *9 (emphasis added). Here, by contrast, even if Graco prevails on its patent claims, there is no prospect of an injunction being issued on an expired patent, "no chance [Carlisle] will be barred from participation in the market," and thus ***no plausible*** claim of future market injury. *Sprint*, 2019 WL 1082067, at *5.

## LEGAL STANDARD

Under Rule 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Eisai*, 821 F.3d at 402 (cleaned up). "Summary judgment is of particular importance in the

area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces." *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (cleaned up). For that reason, "the plaintiff in an antitrust case responding to a summary judgment motion must overcome a higher threshold, which is imposed in order to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *Race Tires*, 614 F.3d at 73.

## ARGUMENT

Carlisle has taken an unusual approach to its monopolization claim, endeavoring to argue that Graco is an anticompetitive monopolist while simultaneously touting the success of Carlisle's recent entry and how effectively it **competes** with Graco. Carlisle apparently understands it cannot prove that Graco's enforcement of the '172 patent has had any material adverse effect on competition in the relevant market. Instead, it has chosen to argue that, because it is now Graco's fiercest competitor, competition **would** be harmed **if** Graco's infringement suit led to Carlisle's exclusion. In so doing, Carlisle has abandoned any hope of proving past or current monopolization due to the '172 patent—Carlisle's conceded success makes that impossible—instead pinning its hopes on proving a substantial likelihood of future monopolization. But that does not work either, because Carlisle's theory of future monopolization depends entirely on Graco receiving an injunction in its infringement suit—something that will never happen. The '172 patent expires in November, before the trial in this case will occur. Graco cannot receive an injunction (or any other prospective relief) to enforce an expired patent. Therefore, the future-exclusion scenario Carlisle depicts is illusory—indeed, impossible.

The bottom line is that Carlisle has no evidence of past or current monopolization, and no plausible (or even possible) theory of future monopolization. In short, it has no triable "Sherman Act monopolization charge," and thus no triable *Walker Process* counterclaim. *Ritz Camera &*

*Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). For these reasons, Graco respectfully moves for summary judgment on Carlisle's counterclaims.

## I.    Carlisle Cannot Prove That Graco's Patent Enforcement Has Created a Plausible Threat of Monopolization.

Carlisle's *Walker Process* claims principally depend on the theory that Graco possessed preexisting monopoly power and used the '172 patent to "maintain" that asserted monopoly. 12(c) Opp. 15. But that theory is dead on arrival because Carlisle's own admissions and various undisputed facts establish that Graco faces formidable competition from Carlisle and others—it has no monopoly in any relevant market. Carlisle's alternative theory—that ***if*** Graco obtained an injunction in its infringement suit, ***then*** Graco would have monopoly power—fares no better, as it is self-evident Graco will never receive an injunction on a patent that expires before trial.[2]

### A.    Graco Lacks Monopoly Power Because, as Carlisle and Its Expert Concede, It Is "Constrained" by "Formidable" Competition.

The most basic requirement for any monopolization claim is "the possession of monopoly power," which the Supreme Court has defined as "the ability to control prices and exclude competition in a given market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Carlisle has no evidence that Graco can do either of those things. To the contrary, Carlisle and its expert ***concede***—as the undisputed evidence proves—that Carlisle has "introduce[d] *more* competition into the market," causing Graco to "lose market share," and subjecting Graco to significant price constraints. 12(c) Opp. 11, 19. Dr. Mathur openly acknowledges that "competition

---

[2] In an attempt to cover every base, Carlisle has also alluded to the theory that Graco used the '172 patent to ***acquire*** (as opposed to "maintain") monopoly power, but that theory too is off limits. As discussed herein, Carlisle effectively admits that Graco does not have monopoly power. Moreover, Carlisle's expert, Dr. Mathur, did not even "assess[] whether Graco acquired market power through use or improper use of the '172 patent." Ex. 12, Mathur Dep. Tr. at 63:1-7. To the extent Graco has any market power, she has no "view one way or another whether the '172 patent or any other patent was the origin or source of [that] market power." Ex. 12, Mathur Dep. Tr. at 94:5-10.

from Carlisle" and other rivals "exert[s] pricing pressure on Graco and constrain[s] price increases," Ex. 11, Mathur Reply ¶ 64, and that Graco's "patent-related conduct . . . has not prevented Carlisle from being a formidable and meaningful competitor to Graco," Ex. 12, Mathur Dep. Tr. at 156:3-15.

Carlisle's admission that Graco faces significant "actual competition" forecloses any finding of monopoly power. *Suture Exp., Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1041-43 (10th Cir. 2017); *see also Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1030 (8th Cir. 2020) (evidence of "intense competition" in the market prevented plaintiff from proving "sufficient monopoly or market power . . . to avoid summary judgment"). A claim of monopoly power is "***presumptively implausible***" when, as in this case, "the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share." *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 110 (1st Cir. 1997) (emphasis added); *see also Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982) (affirming directed verdict for antitrust defendant because plaintiff's "own expert witness testified that the [relevant] market was highly competitive," which "contradicts the claim that one firm was able to control prices").

This case is remarkably similar to *Weber-Stephen*, in which the court held on summary judgment that a *Walker Process* defendant lacked monopoly power as a matter of law because the plaintiff "compete[d] with" the defendant, was "never excluded" from the market, and "continued to sell the allegedly infringing [product]" despite the defendant's patent enforcement. 2015 WL 832306, at *5-6. Here too it is undisputed that Carlisle has never stopped selling its ST1 gun, which Carlisle describes as "major competition" that has reduced Graco's market share and constrained

Graco's pricing. 12(c) Opp. 19. Similarly, in *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, the court granted the defendant summary judgment on a *Walker Process* claim when the "undisputed evidence" showed that the plaintiff, like Carlisle, was "a financially and competitively healthy business" with consistent profits and growing revenues "despite competition from [the] [d]efendant." 392 F. Supp. 2d 118, 130-32 (D.P.R. 2005). Based on that evidence, the court held as a matter of law that the plaintiff's "contention that [d]efendants have a dangerous probability of achieving a monopoly" was "unpersuasive and implausible and create[d] no genuine issue of material fact." *Id.* at 131. The same is true here. *See also Augustine Med., Inc. v. Mallinckrodt, Inc.*, 2003 WL 1873836, at *7, 9 (D. Del. Apr. 9, 2003) (granting summary judgment to *Walker Process* defendant for lack of monopoly power when "market steadily grew" and plaintiff's "market share . . . remained at the same level").

Because Carlisle and its expert openly concede that Graco faces formidable, price-constraining competition, all corroborated by undisputed facts, any effort by Graco to muster indirect proof of monopoly power based on asserted market shares, allegedly high profit margins, or claimed barriers to entry is immaterial as a matter of law. As the Third Circuit has recognized, "market share and barriers to entry are merely surrogates for determining the existence of monopoly power," *Broadcom*, 501 F.3d at 307 n.3; *accord FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). Such "indirect evidence" cannot prove monopoly power without additional "evidence that the challenged restraint harms competition." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) (cleaned up) (quoting *Ohio v. Am. Exp. Co.*, 585 U.S. 529, 542 (2018)).[3] Multiple courts have thus held that when, as in this case, the

---

[3] *See also In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022) (holding "market share alone is insufficient to demonstrate market power; plaintiff must

undisputed evidence shows "***actual competition***" in the market, indirect evidence of factors like "market share" and profit margins are "insufficient to establish market power." *Suture Exp.*, 851 F.3d at 1042-44 (cleaned up and emphasis added); *see also W. Parcel Exp. v. UPS of Am.*, 190 F.3d 974, 976-77 (9th Cir. 1999) (holding evidence of competition foreclosed finding of monopoly power even though plaintiff's "profit margins ha[d] decreased"); *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335-36 (7th Cir. 1986) (holding evidence of "vigorous and effective competition" foreclosed finding of monopoly power despite evidence of defendant's "large market share"); *Weber-Stephen*, 2015 WL 832306, at *6 & n.9 (holding undisputed proof of competition made consideration of "market power" "unnecessary"); *cf. In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 300 (D.R.I. 2019) ("[W]hen direct evidence is dispositive," consideration of "indirect evidence is unnecessary."). Because Carlisle's and Dr. Mathur's concessions conclusively establish that Carlisle has not impaired competition in any relevant market, they cannot, as a matter of law, prove monopoly power through indirect evidence.

Moreover, Carlisle's indirect evidence of monopoly power is plainly not sufficient to create a fact issue on this element, given the direct evidence and admissions discussed above. Dr. Mathur focuses much of her attention on proof of Graco's asserted market share, but the types of proof she relies on are notoriously unreliable. For example, her expert report places heavy reliance on what she ***falsely*** characterizes as a "complaint" the FTC "filed" in "litigation" against Graco. Ex. 9, Mathur Report ¶ 36; *id.* ¶ 83 (referring to "[t]he FTC's 2013 litigation against Graco"). Contrary to these claims, there never was any FTC "litigation," nor any "filed . . . complaint." *Id.* ¶¶ 36, 83. The FTC materials Dr. Mathur references relate to a negotiated consent order settlement from over

---

show market share plus some other ground for believing that the challenged behavior could harm competition in the market" (cleaned up) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998))).

a decade ago, and the FTC's market definition and market share allegations were just that— **allegations** included in an unfiled draft complaint. Courts routinely hold that un-litigated allegations contained in consent order settlements are inadmissible and proof of nothing.[4] And even if the draft FTC complaint could be used as evidence of Graco's market share in **2013**, it reveals nothing about Graco's market share today. Needless to say, the FTC's dated allegations do not account for the conceded fact that "significant," "formidable," "meaningful" competition from Carlisle has caused Graco "to lose" considerable "market share" to its new rival. 12(c) Opp. 19.

Dr. Mathur's deposition revealed that, far from conducting any analysis into whether the FTC's unproven allegations were reliable, she did not even understand the nature of what she was citing. She testified at deposition that she did not know whether the 2013 FTC draft complaint was "ever filed in court," whether "there was a litigation or there was not a litigation," or whether "a consent order constitutes a settlement." Ex. 12, Mathur Dep. Tr. at 105:7-12, 106:10-20, 107:4-18. She also testified that she "do[esn't] know one way or another" if the FTC "actually ever proved" its allegations, and "do[esn't] know the process that underlay that analysis." Ex. 12, Mathur Dep. Tr. at 107:13-25. No surprise, then, that she could not take any position at her deposition on whether she regarded "the FTC's 2013 complaint . . . to be a reliable source of market share information." Ex. 12, Mathur Dep. Tr. at 103:10-23. When asked that question, she demurred, saying only that her "opinions would be the same even if I had not had access to that information." *Id.*

---

[4] *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 n.12 (1961); *FTC v. Walmart Inc.*, 664 F. Supp. 3d 808, 843 n.38 (N.D. Ill. 2023); *Henson v. Turn, Inc.*, 2018 WL 6605624, at *2 (N.D. Cal. Dec. 17, 2018); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2016 WL 10706086, at *4-6 (N.D. Ind. Oct. 28, 2016); *Quasebarth v. Green Tree Servicing, LLC*, 2016 WL 427087, at *3 (M.D. Ga. Feb. 3, 2016); *N.J. Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998).



Similarly unreliable is Dr. Mathur's attempt to derive Graco's market share from ▮▮▮ ▮▮▮▮▮▮▮▮ Ex. 9, Mathur Report ¶¶ 84, 87. ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" Ex. 14, CCM_00010193 at -219, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮, Ex. 9, Mathur Report ¶ 84; Ex. 15, GRACO_0758168. ▮▮▮▮▮▮▮▮▮▮. Yet Dr. Mathur claims to have somehow derived from those responses a conclusion that ▮▮▮ ▮▮▮▮▮. Ex. 9, Mathur Report ¶¶ 84, 87. She offers no explanation for how ▮▮▮▮▮▮ reliably supports (or is even relevant to) any conclusion about market share. Nor do they. Courts routinely reject expert reliance on ▮▮▮, like these, that "failed to ask any questions relevant to th[e] narrow issue" for which the expert cites them. *Ngethpharat v. State Farm Fire & Casualty Co.*, 2021 WL 2823245, at *2-3 (W.D. Wash. July 7, 2021).[5]

Dr. Mathur's report also sought to infer market power from Graco's gross profit margins Ex. 9, Mathur Report ¶ 90 but courts routinely reject these types of arguments as well. Numerous cases recognize that "accounting margins are not reliable evidence of market power." *Inline*

---

[5] *See, e.g.*, *Wing Enters., Inc. v. Tricam Indus., Inc.*, 829 F. App'x 508, 515-16 (Fed. Cir. 2020) (affirming exclusion of survey that "did not ask specifically about" the issue for which it was submitted); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 966-67 (N.D. Cal. 2021) (holding survey that "measure[d] access" to gaming devices could not be used as proof of "substitution" between devices), *rev'd in part on other grounds*, 67 F.4th 946 (9th Cir. 2023); *Multimedia Patent Tr. v. Apple Inc.*, 2012 WL 5873711, at *9 (S.D. Cal. Nov. 20, 2012) (rejecting expert's reliance on surveys based on "generic industry data [that] is not tethered to the relevant facts and circumstances of the present case"); *Steak Umm Co. v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 424 (E.D. Pa. 2012) (excluding survey that "focuses on an inquiry that has no relevance to this case and which has nothing to do with" the issue for which it was submitted).

*Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1210 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020).[6] Dr. Mathur agreed with this at her deposition, where she walked away from her reliance on Graco's margins and admitted, "on its own," evidence of profit margins "is *not proof of market power*." Ex. 12, Mathur Dep. Tr. at 166:7-16 (emphasis added). Moreover, Dr. Mathur's own calculation of Carlisle's and Graco's profit margins for spray guns—

███████████████████████████████████████████, Ex. 10, Mathur Report ¶¶ 90, 117; Ex. 16, CCM_00109420—reveals that Graco's asserted margins are not "drastically above" Carlisle's, which is analogous to the circumstances in *Carpenter*, where summary judgment was granted due to the absence of proof of monopoly power. 2011 WL 4528303, at *12. Nor, as in *Carpenter*, did Dr. Mathur or Carlisle submit any evidence that Graco's margins are "***abnormally*** high." *Id.* (emphasis added). That forecloses any showing of monopoly power based on profit margins. *Id.*

Finally, Dr. Mathur contends there are significant "barriers to entry" in the relevant markets, Ex. 9, Mathur Report ¶ 95, but Carlisle's own conceded success disproves that assertion. Carlisle, by its own admission, is a "new competitor of Graco's" that entered the market in 2020, "only a few months prior to Graco filing this lawsuit." 12(c) Opp. 14. In the short time since then, Carlisle asserts it has already introduced "*more* competition" into the market, ████████████████████

███████████████████, and become Graco's "largest" and "most significant competitor." *Id.* at 1-2, 9, 11-12, 19. As Dr. Mathur acknowledged at her deposition, these asserted barriers are "*not insurmountable*," and "Carlisle has *overcome*" them. Ex. 12, Mathur Dep. Tr. at 143:6-144:19

---

[6] *See also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2022) (holding company's profit margins "reveal[] very little about its market power"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("[I]t is always treacherous to try to infer monopoly power from a high rate of return."); *Garnica v. HomeTeam Pest Def., Inc.*, 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) ("[I]nferring market power from gross margins is a dicey proposition, and high gross margins are generally not by themselves sufficient to prove such power.").

(emphasis added). Carlisle's success in "expand[ing] the market" disproves any assertion "that there are unnatural market barriers precluding robust competition." *W. Parcel Exp.*, 190 F.3d at 976-77; *see also Tops Mkts.*, 142 F.3d at 99 (finding no evidence of "barriers to entry" based on competitor's "successful entry" and acquisition of "high market share within such a short period"); *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 535 (W.D. Pa. 2019) ("The large number of competitors . . . is an indication of the absence of barriers to entry in [the] markets.").

Quite clearly, none of Carlisle's supposed indirect evidence of monopoly power can overcome its and Dr. Mathur's concessions that "formidable" competition has "constrained" Graco. The point of such "indirect evidence" is to determine whether, despite the absence of direct evidence, an accused monopolist has "the ability to control prices and exclude competition in a given market." *Broadcom*, 501 F.3d at 307. Because Carlisle's and Dr. Mathur's concessions establish as a matter of law that Graco has no such ability, Carlisle's supposed indirect evidence cannot create a material fact dispute over monopoly power. *E.g.*, *Suture Exp.*, 851 F.3d at 1042-44.

### B. Carlisle Undisputedly Has Not Been Excluded from the Market by Graco's Patent Enforcement, and There Is No Plausible Threat of Future Exclusion.

Even if Carlisle could prove that Graco has a monopoly, it still cannot prove a monopolization claim because it lacks evidence that Graco has maintained that monopoly through "anticompetitive conduct." *Eisai*, 821 F.3d at 402. For patent enforcement to be anticompetitive, the patent must have "***exclusionary power***" in "the relevant market for the product involved." *Walker Process*, 382 U.S. at 177 (emphasis added). And the "exclusionary power" a patent must have to support a *Walker Process* claim is the power "to 'dominate the market' and 'drive all or most substitutes from it.'" *Weber-Stephen*, 2015 WL 832306, at *5 (quoting *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984) (Posner, J.)). Once again, Carlisle's various admissions preclude it from meeting this burden. Carlisle has not been excluded, no other

competitor has been excluded, Graco does not dominate the market, and Graco faces significant price-constraining competition—Carlisle admits all of this, which, together with the imminent expiration of the '172 patent, defeats any claim of monopolization.

### 1. The '172 Patent Has Not Excluded Competition.

In an antitrust suit, allegedly anticompetitive conduct is not "exclusionary" unless it is "likely to ***foreclose***" competitors "from doing business in the relevant market." *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982, 986 (10th Cir. 2022) (emphasis added). That "foreclosure" must be "substantial," meaning that it "bar[s] a ***substantial*** number of rivals or ***severely*** restrict[s] the market's ambit." *Eisai*, 821 F.3d at 402-03 (cleaned up and emphasis added); *accord Premier Comp Sols.*, 377 F. Supp. 3d at 532; *Sandoz Inc. v. United Therapeutics Corp.*, 2022 WL 17335696, at *15 (D.N.J. Mar. 30, 2022). Carlisle cannot make that showing with respect to Graco's enforcement of the '172 patent because, by its own admission, that "patent-related conduct . . . has not prevented Carlisle from being a formidable and meaningful competitor." Ex. 12, Mathur Dep. Tr. at 156:3-20. Carlisle's undisputed "grow[th]" as a competitor proves that Graco's enforcement of the '172 patent has not "exclude[d] competition." *Suture Exp.*, 851 F.3d at 1043; *see Weber-Stephen*, 2015 WL 832306, at *6 (plaintiff not excluded when it "concede[d] that [it] and others compete with" defendant); *Ramallo Bros.*, 392 F. Supp. 2d at 138 (plaintiff not excluded when it "experienced consistent and increasing profits").

Carlisle also concedes that there are multiple "effective substitutes . . . which do not infringe the ['172] patent," which further establishes that the patent does not "confer[] monopoly power." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 342 (2d Cir. 2024) (cleaned up) (quoting *Walker Process*, 382 U.S. at 177). Carlisle has identified ***eight*** "acceptable non-infringing alternatives" that are currently on the market. Ex. 4, Rog 12 First Supp. Response. Carlisle also admits that "the ['172] Patent is narrow," and that "[a] non-infringing design" that

would "achieve acceptable results" could "be made by minor modifications" to the patented design. Ex. 4, Rog 12 First Supp. Response. These undisputed "substitutes for the patented product" preclude any finding of monopoly power as a matter of law. *Abbott Labs.*, 952 F.2d at 1355.

Despite these critical concessions, Carlisle claims Graco limited or slowed its entry into the marketplace by sending letters that allegedly "threatened" its distributors not to use Carlisle's ST1 gun. But to succeed on that claim, Carlisle must prove that Graco's "supposed threat . . . caused competition to be ***foreclosed*** in a ***substantial share*** of the line of commerce affected." *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1249 (11th Cir. 2022) (cleaned up and emphasis added). But, again, Graco's concessions and the undisputed evidence prove the opposite. It is undisputed that Carlisle has continued selling the ST1 gun to multiple distributors who received Graco's letters. Ex. 8, Sowada Dep. Tr. at 100:24-101:2, 102:10-103:3, 105:20-106:23, 140:20-141:22; Exs. 2,3, 5-7, 13. Indeed, Carlisle's market share and ST1 revenues ***increased*** after Graco sent its allegedly threatening letters, with most of those sales ***coming from distributors who received Graco's letters***. Ex. 8, Sowada Dep. Tr. at 62:20-63:24, 72:20-25; Ex. 10, Maness Rebuttal ¶¶ 76, 92. The fact that multiple distributors "continued selling" Carlisle's ST1 gun despite Graco's letters prevents Carlisle from proving substantial foreclosure as a matter of law. *OJ Commerce*, 34 F.4th at 1250.

In addition, ████████████████████████████████████████████████
████████████████████████████████████████████████████████. Ex. 9, Mathur Report ¶¶ 45-46, 107-08; Ex. 10, Maness Rebuttal ¶¶ 76-77. It is undisputed that Carlisle has developed relationships with distributors who did not receive Graco's letter and has increased its distributors ███████████████ Ex. 8, Sowada Dep. Tr. at 103:23-104:4; Ex. 10, Maness Rebuttal ¶ 81. As Carlisle's own Director of Sales testified, "there's a lot of distributors out there"

who "don't care what Graco has to say" and who do not want to "deal with" Graco. Ex. 8, Sowada Dep. Tr. at 64:18-65:3. Carlisle's access to those and other distributors proves Carlisle has not been **excluded** from the market. *E.g.*, *EpiPen*, 44 F.4th at 989-90 (finding no exclusion on summary judgment when plaintiff was foreclosed from 31 percent of the market but regained market share through new pricing and marketing strategies).

To argue otherwise, Carlisle and Dr. Mathur contend that **any** lost sale, discouraged distributor, or business delay amounts to "exclusion." Ex. 11, Mathur Reply ¶¶ 54-60; Ex. 12, Mathur Dep. Tr. at 82:7-18, 126:4-15. Yet this effort to characterize *de minimis* business interruptions as "exclusion" is incorrect as a matter of law. Because anticompetitive conduct requires "substantial foreclosure" of competition—not "merely disadvantage [to] rivals"—the defendant's "challenged practices must bar a *substantial* number of rivals or *severely* restrict the market's ambit." *Eisai*, 821 F.3d at 403 (emphasis added).

Courts thus reject Carlisle's theory that "anything that hobbles its own business gives [the defendant] increased market power and hurts competition overall." *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013). In *Sandoz*, for example, the plaintiff claimed that the defendant's conduct led to a "delay in launching its [product]," which the court held was insufficient "to create a genuine issue of material fact" as to "anticompetitive consequences." 2022 WL 17335696, at *16. Although the plaintiff's entry into the market was delayed, it was "not driven out or foreclosed" from the market. *Id.* The "inconvenience" of the delay, therefore, "did not deprive [it] from an opportunity to compete." *Id.* at *15. The same is true here, where Carlisle concedes that any lost sales or delay in finding distributors it allegedly experienced have not "prevented [it] from being a formidable and meaningful competitor to Graco" or from "gain[ing] meaningful [market] share" at Graco's expense." Ex. 12, Mathur Dep. Tr. at

18

66:13-67:2, 156:3-20; *see* 12(c) Opp. 19. Indeed, courts have found no anticompetitive conduct as a matter of law based on evidence of far more substantial business losses than Carlisle claims to have suffered. *E.g.*, *EpiPen*, 44 F.4th at 989-90 (granting summary judgment on antitrust injury despite plaintiff's exclusion "from 31% of the U.S. population"); *OJ Commerce*, 34 F.4th at 1250 ("a foreclosure percentage of at least 40% has been a threshold for liability").

## 2.    The '172 Patent Creates No Plausible Risk of Future Exclusion.

Having essentially conceded that Graco's enforcement of the '172 patent has not caused any past or current exclusion, Carlisle has reverted to the argument that *if* Carlisle were to be excluded through a patent injunction in this case, **then** competition would be harmed. *E.g.*, 12(c) Opp. 10, 14. But the predicate for Carlisle's *if-then* argument—Graco's receipt of an injunction— is implausible; there will never be an injunction. The '172 patent expires in November 2024, before the trial date, and "patentees cannot enjoin infringers or demand royalty payments for infringement occurring after a patent has expired." *Sprint*, 2019 WL 1082067, at *5 (cleaned up); *see Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001). Because Graco cannot receive an injunction in its infringement suit, there is no risk that a victory in Graco's suit will lead to Carlisle's (or any other competitor's) future exclusion from the market.

In *Sprint*, a court in this District reached the same conclusion. The counterclaim plaintiff in that case, just like Carlisle here, supported its *Walker Process* claim by arguing that it would be excluded from the market if the counterclaim defendant succeeded in its patent infringement suit. 2019 WL 1082067, at *5. Because the patent had expired, however, the court held as a matter of law that, regardless of how the infringement suit turned out, there was "no chance" the plaintiff would "be barred from participation in the market." *Id.* at *6. The same is true here, where it is undisputed that the '172 patent will expire before trial. As in *Sprint*, therefore, Carlisle "will be able to continue to practice the claimed technology rent free" even if Carlisle prevails at trial. *Id.*

19

That renders implausible—indeed, impossible—any theory of exclusion premised on future enforcement of the '172 patent.

Other courts have rejected similarly implausible theories of patent-based exclusion. For example, in *California Eastern Laboratories, Inc. v. Gould*, 896 F.2d 400, 403 (9th Cir. 1990), the Ninth Circuit held the plaintiff could not pursue a *Walker Process* claim after the district court decided in a declaratory judgment action that the relevant patents belonged to the plaintiff rather than the defendant. Because the defendant no longer owned the patents, it could not "enforce them," and "[w]ithout some effort at enforcement, the patent cannot serve as the foundation of a monopolization case." *Id.*; *see also Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003) (finding no risk of harm from enforcement of a patent after defendant stopped making "patent threats"). Likewise, Graco will not be able to prospectively enforce the '172 patent after it expires, eliminating such prospective enforcement as a possible "foundation of a monopolization case." *Gould*, 896 F.2d at 403. More recently, the court in *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, held that *Walker Process* plaintiffs could not "plausibly establish antitrust injury" after the defendant "stopped pressing its [patents] in litigation." 2024 WL 2861865, at *83-84 (D.N.J. June 6, 2024). The same principle applies here, given that the '172 patent cannot plausibly have any effect on competition after it expires.

## II.    Carlisle Cannot Prove That Graco's Patent Enforcement Has Harmed Competition.

Even if Carlisle had a plausible theory of actual or threatened monopolization caused by the '172 patent, Graco would still be entitled to summary judgment because Carlisle's concessions that Graco's "patent-related conduct . . . has not prevented Carlisle from being a formidable and meaningful competitor to Graco," Ex. 12, Mathur Dep. Tr. at 156:3-20, foreclose it from proving "antitrust injury" or "harm to competition," *Race Tires*, 614 F.3d at 83.

Carlisle seeks to prove antitrust injury through purely *individual* harms such as litigation costs and alleged lost sales, but an antitrust plaintiff must prove "harm *to competition*, not just harm to the plaintiff." *Race Tires*, 614 F.3d at 83 (emphasis added); *see also Broadcom*, 501 F.3d at 308 ("Conduct that merely harms competitors, . . . while not harming the competitive process itself, is not anticompetitive."). And because Carlisle admits it "has had the clear opportunity to compete and did compete, sometimes successfully," with Graco notwithstanding the '172 patent, it cannot prove "the kind of injury that gives rise to an antitrust claim." *Race Tires*, 614 F.3d at 84; *see also Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 122-23 (1st Cir. 2011) (finding no antitrust injury on summary judgment when plaintiff's "sales, profits, and market share have increased during the relevant period"). In *Weber-Stephen*, for example, the court granted summary judgment on a *Walker Process* claim for lack of antitrust injury where, despite the defendant's patent-infringement lawsuits, the market remained "competitive" and the plaintiff was "never excluded." *Weber-Stephen*, 2015 WL 832306, at *5-6 (alterations omitted). The record compels the same result here, given that undisputed facts and Carlisle's various admissions unequivocally establish that Graco faces significant, meaningful competition from Carlisle and others.

### A.    Carlisle's Individual Litigation Expenses Are Not Antitrust Injury Absent Broader Harm to Competition.

Carlisle, having effectively conceded the absence of harm to competition, presses the remarkable theory that patent defense expenses are always "*per se* adequate" to prove antitrust injury. 12(c) Opp. 6. But *TransWeb*, the primary case Carlisle cites for its argument, held no such thing. *TransWeb* held only that litigation expenses *can* be an antitrust injury when a plaintiff "prove[s]" that the defendant's lawsuit, if successful, would have had a "harmful effect on competition." 812 F.3d at 1309. The plaintiff in *TransWeb* "*proved* at trial that increased prices . . . *would have resulted* had [the defendant] succeeded in its suit," thus establishing that the

defendant's "unlawful act was *in fact* aimed at reducing competition and *would have done so* had the suit been successful." *Id.* (emphasis added). The Federal Circuit made clear, however, that when the "antitrust-defendants' actions, though unlawful, would *not* have actually reduced competition," individual losses are *not* antitrust injury. *Id.* (emphasis added). Indeed, the Federal Circuit had held before *TransWeb* that "expenses in defending [a] suit" are not antitrust injury when they are not "caused by an actual lessening of competition." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1557-58 (Fed. Cir. 1997), *abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). Nothing in *TransWeb* purported to overrule that earlier decision.

Nor did this Court hold in *NRT* that litigation expenses are *always* an antitrust injury. As in *TransWeb*, this Court held nothing more than that "attorney's fees incurred by a competitor in defending an infringement suit *can be* an antitrust injury" when the plaintiff establishes that "the market as a whole would have suffered injury" if the defendant's infringement suit had been successful. 2020 WL 3403091, at *9 (emphasis added). This Court thus denied a motion to dismiss because it was "*plausible* that the market as a whole would have suffered injury" if the defendant had received an injunction against the plaintiff in its infringement suits. *Id.* (emphasis added)

Under *TransWeb* and *NRT*, therefore, "[l]itigation expenses are not an antitrust injury *per se.*" *Sprint*, 2019 WL 1082067, at *5. They can be an antitrust injury "only when competition would be impacted by a verdict for the plaintiff," which is manifestly not true here. *Id.*; *accord Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 187 F. Supp. 3d 483, 487 (D.N.J. 2016); *GlobalTap LLC v. Smart Tap LLC*, 2015 WL 791256, at *5 (N.D. Ill. Feb. 24, 2015); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, 2006 WL 13058, at *5 (N.D. Cal. Jan. 3, 2006). Any contrary holding would be irreconcilable with the Supreme Court's clear rule that "[a]ntitrust injury does not arise . . . until

a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 339 (1990) (emphasis in original); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012) ("[A] lack of anticompetitive conduct precludes a finding of antitrust injury . . . .").

If Carlisle's audacious legal argument were correct, no *Walker Process* counterclaim could **ever** fail for lack of anticompetitive conduct or antitrust injury. As Carlisle would have it, "a party that must spend money to defend against an infringement suit based on [an allegedly] fraudulent patent" would, in all cases, have "***automatic antitrust injury***." 12(c) Opp. 1 (emphasis added). That is not the law—a *Walker Process* counterclaim plaintiff, like any other antitrust plaintiff, must separately prove "all other necessary elements of a § 2 claim," including "anticompetitive conduct" and "antitrust injury." *Unitherm*, 375 F.3d at 1363. Courts thus routinely reject *Walker Process* counterclaims where there is a failure to prove anticompetitive conduct or antitrust injury,[7] something no court could ever do if Carlisle's interpretation of *TransWeb* were correct.

Unlike the plaintiffs in *TransWeb* or *NRT*, Carlisle cannot "tether [its] payment of defense costs in this litigation . . . to harm borne by the market-at-large." *Otsuka*, 187 F. Supp. 3d at 487. It is **not** plausible—or even possible—that Graco will receive an injunction against Carlisle if it succeeds in its infringement suit because the '172 patent will expire before trial. *Sprint*, 2019 WL 1082067, at *5. For that reason, its expenses "demonstrate little more than that [Graco's] claimed conduct had an adverse financial effect on a *particular* competitor," which is not "a qualifying antitrust injury" as a matter of law. *Otsuka*, 187 F. Supp. 3d at 487.

---

[7] *E.g.*, *id.* at 1365; *Weber-Stephen*, 2015 WL 832306, at *5; *GlobalTap*, 2015 WL 791256, at *5; *Ramallo Bros.*, 392 F. Supp. 2d at 131-32; *Augustine Med.*, 2003 WL 1873836, at *9.

**B.    Carlisle's Individual Economic Harms Are Not Antitrust Injury, and There Is No Plausible Risk of Future Antitrust Injury.**

The same is true of Carlisle's alleged lost sales, lost distributors, and delays in market growth, which Carlisle and Dr. Mathur concede have not prevented Carlisle from successfully competing with Graco. Carlisle thus presses the novel, unsupportable theory that antitrust injury exists merely because it theoretically could have competed *more* successfully absent the '172 patent. *E.g.*, Ex. 11, Mathur Reply ¶¶ 7, 54; Ex. 12, Mathur Dep. Tr. at 69:11-17, 126:10-13, 130:18-23, 142:21-25, 151:14-16, 154:10-155:19, 158:25-159:2. Carlisle and Dr. Mathur argue that Carlisle potentially could have made more sales, and expanded its market share more quicky, if Graco had not enforced the '172 patent. *Id.* But it is simply not true that "anything that hobbles [a plaintiff's] own business" necessarily "hurts competition overall." *Gorlick*, 723 F.3d at 1025. The Supreme Court held long ago that plaintiffs cannot prove antitrust injury merely by "demonstrat[ing] . . . that they are in a worse position than they would have been" in the absence of a defendant's challenged conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977); *see also Atl. Richfield*, 495 U.S. at 337-38 (no "antitrust injury" based on "business lost by rivals"). Since then, the Third Circuit has "consistently held an individual plaintiff personally aggrieved by" alleged anticompetitive conduct "has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001); *see also Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018) ("[L]ost business alone cannot be deemed a consequence of 'anticompetitive' acts by the defendant.").

Here, Carlisle's evidence shows at most individual "financial hardship" with no "negative impact on consumers or to competition in general." *Phila. Taxi Ass'n,*, 886 F.3d at 344. Carlisle claims it lost some sales and experienced some delays in acquiring distribution because of the

patent dispute, but neither Carlisle nor Dr. Mathur offers any evidence tying those alleged lost sales or delays to any material loss of "competition in the market as a whole." *Gorlick*, 723 F.3d at 1025. Dr. Mathur merely speculates that competition **could** be harmed **if** Graco were "successful" in "foreclosing competition from Carlisle." Ex. 9, Mathur Report ¶¶ 104-06; *see* Ex. 12, Mathur Dep. Tr. at 31:13-35:12, 75-76:4. But again, there is no plausible risk that Graco ever will foreclose competition from Carlisle, since the '172 patent expires before trial. Such an implausible—indeed, impossible—theory of antitrust injury cannot survive summary judgment. *See also, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (ordering summary judgment against plaintiff for "alleged conspiracies [that] *could not have* caused . . . 'antitrust injury'" (emphasis added)); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (rejecting "impossible" theory of antitrust injury); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 846 (N.D. Ill. 2020) (rejecting theory of "antitrust injury" as "speculative" and "not plausible"); *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 259 (D.P.R. 2010) (finding theory of antitrust injury "implausible in light of [plaintiff's] increased profits, sales, and market share"), *aff'd*, 656 F.3d 112 (1st Cir. 2011).

That aside, courts have properly rejected as "pure speculation" testimony like Dr. Mathur's that "*potential elimination*" of "competitor[s] *can lead to* less competition, less choice for the consumer and higher prices in the market." *Premier Comp Sols.*, 377 F. Supp. 3d at 533. That is because "[o]ne competitor's inability to compete does not automatically mean competition has been foreclosed." *Eisai*, 821 F.3d at 403-04; *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) ("[R]emoval of one or a few competitors need not equate with injury to competition."); *Siegler v. Sorrento Therapeutics, Inc.*, 2019 WL 581719, at *12 (S.D. Cal. Feb. 13, 2019) ("[E]ven if [p]laintiff, as a would-be competitor, was entirely excluded from

the . . . market, such an injury would not suffice to demonstrate an antitrust injury."). An antitrust plaintiff cannot simply assume "that a monopolist can freely engage in the requisite anticompetitive conduct—reducing output or increasing prices—once it forecloses its competitor from the market." *EpiPen*, 44 F.4th at 986. Instead, "one must look to **economic data** to determine the impact of the purported illegal activity on the market." *Agrashell, Inc. v. Hammons Prods. Co.*, 479 F.2d 269, 285-86 (8th Cir. 1973) (emphasis added); *see also Eisai*, 821 F.3d at 407 ("[A]n assumption cannot serve as a substitute for actual evidence at the summary judgment stage.").

That requires "specific and concrete factual evidence of actual [anticompetitive] effects," such as "an actual reduction in output, or increase in price, or deterioration in quality." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085, 1087 (11th Cir. 2016).[8] Carlisle effectively concedes that it has no such actual evidence of past or current competitive harms, since it touts its own competitive success and Dr. Mathur has conducted no "empirical analysis" of actual prices or output. Ex. 12, Mathur Dep. Tr. at 181:4-15, 189:14-17. And Carlisle's implausible theory of future, injunction-based exclusion depends on errant speculation about the "*predictable* anticompetitive consequences" of the defendant's conduct, which is insufficient to create a triable issue on summary judgment. *Procaps*, 845 F.3d at 1085. In *Procaps*, for instance, the plaintiffs' experts, like Dr. Mathur, "based [their] predictive opinion[s] not on any specific examples of such effects," but on their "abstract understanding of market conditions." *Id.* The Eleventh Circuit held that such "[e]xpert testimony . . . regarding the likely effect of removing a competitor cannot take the place of presenting specific and concrete facts." *Id.* Similarly, the Federal Circuit held in *Unitherm* that the plaintiff's *Walker Process* claims "should never have reached the jury" because its expert

---

[8] *See also Eisai*, 821 F.3d at 403 (requiring evidence of "reduced output, increased price, or reduced quality" on summary judgment); *Premier Comp Sols.*, 377 F. Supp. 3d at 531 (same); *Sandoz*, 2022 WL 17335696, at *16 (same).

"provided economic evidence insufficient to convince any reasonable jury" that the defendant's patent enforcement "harmed a relevant antitrust market." 375 F.3d at 1363. Instead, like Dr. Mathur, the expert offered "conclusory testimony" that merely "inferred antitrust injury from economic loss." *Id.* at 1365. As in *Unitherm*, therefore, Dr. Mathur's opinion is inadequate to present Carlisle's theory of future antitrust injury to the jury.

Dr. Mathur's opinion is further inadequate to create a triable issue on antitrust injury because she does not "attempt[] to show any form of causality, a critical element needed to establish antitrust injury." *Unitherm*, 375 F.3d at 1365. While she purports to calculate Carlisle's lost sales to ███████████ who received Graco's allegedly threatening letter, she expressly **did not** "assess whether Graco's conduct **caused** distributors not to purchase from Carlisle." Ex. 9, Mathur Report ¶¶ 108, 110 (emphasis added); *see* Ex. 12, Mathur Dep. Tr. at 30:5-18, 38:22-39:19. As a result, she did not and could not "segregate the losses caused by acts which were not antitrust violations from those that were." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159-60 (9th Cir. 2015) (cleaned up). Nor did she try to account for the numerous "other factors [that] could have contributed to [Carlisle's] losses." *Id.* at 1159. That too forecloses Carlisle from proving antitrust injury based on its individual economic losses. *See Unitherm*, 375 F.3d at 1365 (holding *Walker Process* plaintiff did not prove antitrust injury as a matter of law when expert did not "differentiate harm attributable to [defendant's] *antitrust* liability from harm attributable to other allegations" or "differentiate between [defendant's] liability and other potential causes of the losses"); *Revlimid*, 2024 WL 2861865, at *84 (dismissing *Walker Process* claim because plaintiffs did not "show that the harm they claim to have experienced . . . was caused by [defendant's] enforcement of its allegedly fraudulently procured [p]atents").

## <u>CONCLUSION</u>

For all the above reasons, the Court should grant Graco summary judgment on Carlisle's

*Walker Process* counterclaims.

Dated: June 21, 2024

*Of Counsel*:

M. Sean Royall
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20006
Tel: (202) 626-2994
sroyall@kslaw.com

Emily S. Newton
KING & SPALDING LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, GA 30309
Tel: (404) 572-2745
enewton@kslaw.com

Brent P. Ray
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: (312) 764-6925
bray@kslaw.com

Abby L. Parsons
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002
Tel: (713) 751-3294
aparsons@kslaw.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Colin A. Keith (No. 7074)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 N. King St.
Wilmington, DE 19801
(302) 576-3586
pkraman@ycst.com
ckeith@ycst.com
jsiew@ycst.com

*Attorneys for Plaintiffs*
*Graco Inc. and Graco Minnesota Inc.*

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 21, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Anthony D. Raucci
MORRIS,NICHOLS,ARSHT
&TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

Gregg F. LoCascio, P.C.
Nathan S. Mammen
Matthew S. Owen, P.C.
Nichole DeJulio
Karthik Ravishankar
Cole T. Tipton
Meredith Pohl
Mary-Kathryn Hawes
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Alexandria Ray
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

*Attorneys for Carlisle Construction Materials,*
*LLC and Carlisle Companies, Inc.*

Dated: June 21, 2024

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

 */s/  Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Colin A. Keith (No. 7074)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 N. King St.
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
ckeith@ycst.com
jsiew@ycst.com

*Attorneys for Plaintiffs Graco Inc. and*
*Graco Minnesota Inc.*