IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GRACO INC., GRACO MINNESOTA INC. | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 21-245 |
| | : | |
| CARLISLE CONSTRUCTION MATERIALS, LLC | : | |

# MEMORANDUM

**MURPHY, J.**                                                              **October 3, 2024**

This is a patent infringement case with *Walker Process* counterclaims. Graco is the leader in spray-foam insulation equipment and alleges that Carlisle is infringing its spray-gun patent. Carlisle counters that Graco is a monopolist that violated the antitrust laws by attempting to enforce a patent obtained through fraud on the Patent Office.

This decision addresses two motions for summary judgment regarding Carlisle's *Walker Process* antitrust counterclaims. Carlisle moved for partial summary judgment on market definition, a part of its antitrust claim. Graco opposed that and filed its own motion for summary judgment seeking dismissal of Carlisle's *Walker Process* claims. Carlisle's motion asks us to hold that spray-foam guns are a relevant antitrust market. Graco argues that a jury must resolve the question. Graco's motion argues that Carlisle's *Walker Process* claims are foreclosed due to the competitive constraint that Carlisle had on Graco and a purported lack of harm to competition.

We heard oral argument on both motions. Following oral argument, and after close review of the briefing, we deny both motions. There are genuine disputes of fact regarding market definition, monopoly power, and antitrust injury that must go to a jury.

I. **Legal Standard**

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We view all evidence in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Am. Eagle Outfitters. v. Scott*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).

II. **Analysis**

Graco moved for summary judgment on Carlisle's *Walker Process* claims, arguing that Carlisle cannot prove monopoly power or antitrust injury.  DI 323.  Because this motion could dispose of the *Walker Process* claims entirely, we address it first.  We find several genuine disputes of material fact.  And because the *Walker Process* claims will proceed to trial, we then address Carlisle's motion for partial summary judgment on market definition.  DI 321.  Carlisle asks us to recognize spray-foam guns as a relevant antitrust market.  That too will be a question for the jury.  The factual background relevant to these two motions will be addressed in context, below.

      **A. A reasonable juror could find that Graco possessed monopoly power —
or a dangerous probability of achieving it — and caused harm to
competition.**

Under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, "the enforcement of a patent procured by fraud on the Patent Office" may violate the antitrust laws,

in particular "§ 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." 382 U.S. 172, 174 (1965). Section 2 of the Sherman Act prohibits monopolization and attempted monopolization. 15 U.S.C. § 2. Monopolization under § 2 requires a showing of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (quoting *United States v. Grinnell*, 384 U.S. 563, 571 (1966)). Attempted monopolization requires only "a dangerous probability of achieving monopoly power" plus a showing of "predatory or anticompetitive conduct with [] a specific intent to monopolize." *Id.* at 306.

Graco argues that the *Walker Process* antitrust claims fail because Carlisle cannot show that Graco had monopoly power or a dangerous probability of achieving it. Additionally, Graco argues that Carlisle cannot succeed on a § 2 claim because it has failed to demonstrate an antitrust injury. We address monopoly power first, followed by antitrust injury, and conclude that a reasonable juror could find in favor of Carlisle on both issues.

### i. Monopoly Power

Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. It can be shown through direct evidence of a purported monopolist controlling price or excluding competition, or it can be inferred from indirect evidence of a "predominant share of the market." *Id.* The Third Circuit has held that a market share "significantly larger than 55%" is enough for a prima facie showing of monopoly power, and a persistently high market share between 75 and 80% is "more than adequate" to establish a prime facie case of monopoly

power. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187-88 (3d Cir. 2005). When inferring monopoly power through market share, "the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand" should also be considered. *Id*. at 187.

Graco argues that the presence of direct evidence demonstrating the existence of competition means we may not look to indirect evidence to determine whether Graco has monopoly power. DI 326 at 22. The Third Circuit tells us differently in *Broadcom*: "The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output . . . . It may also be inferred from the structure and composition of the relevant market." 501 F.3d at 307. Under *Broadcom*, it is appropriate for us to evaluate Graco's market share, along with characteristics of the market, to determine whether Graco possesses monopoly power — even when Graco points to purportedly direct evidence of competition.[1]

That said, even if we accept Graco's position that only direct evidence may be considered when it exists, we still find that a reasonable juror could conclude that Graco possessed the power to control prices or exclude competition. The direct evidence Graco primarily points to is isolated statements from Carlisle's expert, Dr. Mathur, that Carlisle and

---

[1] Not only does *Broadcom* give us two ways to establish monopoly power — direct or indirect evidence — but it also discusses only *proving* monopoly power, as opposed to disproving it. 501 F.3d at 307. While it is certainly antitrust plaintiff's burden to prove monopoly power, *Broadcom* does not tell us that an antitrust defendant may escape liability by pointing to evidence of competition when they (1) have high market share and (2) exist in a market with unfavorable competitive conditions. Moreover, the Supreme Court has underscored that "the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so." *American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946).

others exerted competitive pressure on Graco.  DI 326 at 12, 15-16.  This does not necessarily mean that prices fell below, or output increased above, the competitive level.  Additionally, the paragraphs that Graco cites for Dr. Mathur's assertions that Carlisle provided a competitive restraint are not as clear as Graco suggests.  Dr. Mathur caveated each of these statements.  For example, Dr. Mathur noted that Graco maintains a dominant position and that Carlisle could have exerted more competitive pressure in the absence of the alleged conduct.  DI 328-1 at 143 (¶ 106); DI 328-2 at 17 (¶ 64).  Whether the purported direct evidence raised by Graco actually demonstrates its inability to control prices or exclude competition is a question for the jury.

Moreover, a reasonable juror could find monopoly power in light of Graco's market share and the conditions of the market.  Carlisle cites evidence identifying Graco as having a large market share since 2013.  DI 365 at 12-13.  In response, Graco criticizes the way that Carlisle computed market share.  DI 326 at 18-22.  Those concerns, including that the numbers may not be sufficiently precise due to the conditions under which they were generated, are valid. *Id.* at 18-22.  However, the criticisms do not rule out the possibility that Graco maintains a dominant share of the market, especially considering the testimony from Graco employees, business documents, and expert substantiation.  DI 365 at 12-13.   In short, how much weight this disputed data should be given is a question for the jury to decide.  Under *Dentsply*, Graco's alleged market share is sufficient to survive summary judgment.  399 F.3d at 187-88.  This purportedly large market share, especially in light of the alleged market characteristics, including high barriers to entry and insulation of Graco by patent claims, DI 365 at 13, could lead a reasonable juror to find monopoly power.  The above analysis also demonstrates how a reasonable juror could find attempted monopolization (i.e., that Graco has a dangerous

5

probability of achieving monopoly power). [2]

### ii.     Antitrust Injury

Antitrust injury requires "harm to competition" (i.e., substantial harm to the competitive process across the market as a whole, "not just harm to the plaintiff competitor)." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010).  An antitrust plaintiff may recover for injuries that flow directly from harm to competition. *TransWeb, LLC v. 3M Innovative Props., Co.*, 812 F.3d 1295, 1309-10 (Fed. Cir. 2016).  That often means lost profits. *See e.g., Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 228 (E.D. Pa. 2017) ("An antitrust plaintiff who is excluded from the relevant market by anticompetitive activity is entitled to recover his lost profits.") (quotations omitted); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 123-24 (1969) (reasoning that the damage to plaintiffs included "the decline in prices, profits and values, not shown to be attributable to other causes").

In the Third Circuit, attorneys' fees incurred to defend a patent infringement suit filed "in furtherance of a broader anticompetitive scheme" constitute a cognizable antitrust injury flowing directly from the defendant's harm to competition. *TransWeb*, 812 F.3d at 1312 (applying Third Circuit law).  This is limited to when the "competition-reducing aspect" of the defendant's conduct is "its attempt at achieving a monopoly by bringing the subject lawsuit." *Id.* at 1310.

---

[2] Proving monopoly power with indirect evidence requires definition of the relevant market. *Broadcom*, 501 F.3d at 307.  Graco does not move for summary judgment on a failure by Carlisle to define a relevant market, and Graco's arguments seem to assume the spray-foam-gun market for the purposes of the motion.  Moreover, Carlisle's brief supporting its partial motion for summary judgment on market definition, DI 322, suggests that a reasonable juror could find spray-foam guns to be a relevant market.  Therefore, we do not closely analyze the question of market definition for the purpose of deciding Graco's motion but find that there is a genuine dispute over whether Graco had a monopoly in the purported spray-foam-gun market.

The relevant query is not simply whether the defendant pursued a lawsuit to enforce a fraudulently obtained patent. Rather, we must ask whether the defendant sought to achieve (or maintain) their monopoly *through* the lawsuit. *Id.* Put another way, a patent holder filing a lawsuit asserting a fraudulently obtained patent does not automatically cause an antitrust injury. It becomes an antitrust injury when "the patentee force[s] the defendant into a position of having to choose from three alternatives: cease competition, take a license, or defend the infringement action." *Id.* In that instance, "attorney fees are themselves both injury-in-fact and sufficiently stemming from the competition-reducing aspect of [the antitrust defendant's] behavior to qualify as antitrust injury." *Id.* The attorneys' fees flow from the competition-reducing aspect of the defendant's behavior in the same way as lost profits.

We find that there is a potential antitrust injury caused by Graco's alleged anticompetitive conduct of competitor intimidation, including its infringement lawsuit, and threats against distributors. Graco argues that Carlisle cannot establish antitrust injury because it "has had the clear opportunity to compete and did compete, sometimes successfully." DI 326 at 28. This argument highlights the tension in *Walker Process* claims after *Transweb*. Traditionally, successful competition against an antitrust defendant could preclude a finding of antitrust injury. *See Race Tires*, 614 F.3d at 73 (finding no antitrust injury when plaintiff "ha[d] otherwise not suffered any cognizable antitrust injury because it has had the opportunity to bid on exclusive supply deals and has in fact done so with some success.") But as *Transweb* explains, when a defendant seeks to achieve (or maintain) its monopoly through a lawsuit, a plaintiff is forced cease competition, take a license, or defend the infringement action. 812 F.3d at 1310. That Carlisle chose to continue competing while defending against the infringement

7

action — as opposed to ceasing competition to avoid the lawsuit (and perhaps seeking lost profits in a separate lawsuit instead) — does not preclude a finding of antitrust injury. *Id.* at 1312 ("If we were to hold that TransWeb can seek antitrust damages only under option one, forfeiture of competition, but not option two, defending the anticompetitive suit, then we would be incentivizing the former over the latter. This would amount to incentivizing TransWeb to forfeit competition rather than continue it. This is not in accord with the purpose of those very same antitrust laws.").

Graco also argues that attorneys' fees are barred because the patent will expire by the time trial concludes, meaning Carlisle could never be forced from the market by an injunction. DI 326 at 30. The Federal Circuit did not address the relevance of timing as it pertains to patent expiration or injunctions in *Transweb*. Perhaps that is because an antitrust injury occurs when an antitrust plaintiff is put to the choice of defending itself or leaving the market, not on some hypothetical future date when an injunction may be issued. An injunction might increase an antitrust plaintiff's claims to lost profits, but that does not mean the availability of an injunction is a prerequisite to establishing antitrust injury.

Graco correctly quotes *Transweb* that the plaintiff "proved at trial that increased prices . . . would have resulted had [the defendant] succeeded in its suit." DI 326 at 29; 812 F.3d at 1309. But it is helpful to see that quote in full context:

> [Antitrust defendant's] argument focuses on the fact that the harmful effect on competition proven by TransWeb at trial never actually came about. TransWeb proved at trial that increased prices for fluorinated filter media and respirators would have resulted had [defendant] succeeded in its suit. However, because TransWeb prevailed, these effects never materialized.

*Transweb*, 812 F.3d at 1309. To us, the central point of this quote is that prices would have

increased had the antitrust defendant won the infringement suit and therefore pushed Transweb out of the market. That would have occurred if Transweb had chosen to not defend itself against the anticompetitive infringement suit. Because Transweb opted to defend itself, and won, "these effects never materialized." *Id.* Transweb's attorneys' fees were recoverable because they "flow[ed] directly from this unlawful aspect of [the defendant's] act," which was the defendant's "attempt to gain a monopoly based on this fraudulently-obtained patent." *Id.* The attorneys' fees were not awarded based on future competition protected — calculated with respect to the years left on the patent at the date of the trial victory — but rather on the cost "incurred defending the infringement suit." *Id.* at 1312. The same could be true here if Carlisle succeeds on its *Walker Process* claims at trial, even if the patents expire before a verdict is issued.

Moreover, Carlisle's choice to defend itself against Graco's purportedly anticompetitive patent suit is a key reason that an injunction has not been issued. Graco put Carlisle to the choice of defending itself or leaving the market. Carlisle chose to defend itself. A hypothetical alternative is illustrative here: Had Carlisle chosen to not defend itself against the purportedly anticompetitive lawsuit and instead allowed an injunction to be entered against it, Graco would have "succeeded in its suit" and forced Carlisle out of the market. In reality, Carlisle chose to compete. Now, as described in *Transweb*, Carlisle must "prove[] at trial that increased prices . . . would have resulted" in the hypothetical alternative. *Id.* at 1309. If Carlisle proves that to the jury, then it can proceed to establish an antitrust injury under *Transweb*.[3]

---

[3] Graco argues that we should follow *Sprint Communications Co. v. Charter Communications, Inc.*, No. 17-1734, 2019 WL 1082067, at *6 (D. Del. Mar. 7, 2019), where Judge Andrews granted a motion to dismiss *Walker Process* claims seeking attorneys' fees after *Transweb*. Judge Andrews found that "[antitrust plaintiffs] ha[d] not alleged an antitrust injury

9

### B. A reasonable juror could find that spray-foam guns do not constitute a product market.

Carlisle seeks partial summary judgment on market definition, an issue for which Carlisle has the burden of proof. The summary judgment standard is more stringent here than when the movant lacks the burden of proof. "Where the party moving for summary judgment . . . bears the burden of proof at trial, the standard is more stringent. The Third Circuit has stated that 'where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented.'" *Nat'l State Bank v. Fed. Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992) (quoting *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992)). "Where the movant is . . . the party without the burden on the underlying claim, the movant has no obligation to produce evidence negating its opponent's case. The moving party merely has to point to the lack of any evidence supporting the non-movant's claim." *Id.*

The issue Carlisle's motion seeks to resolve is market definition. Implicit in an antitrust violation under § 2 of the Sherman Act is the question of how to define the relevant product market. "The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.'" *Fineman v. Armstrong World Indus.*,

---

sufficient to support their counterclaims" because the "antitrust defendant's actions would not have resulted in reduced competition." *Id.* at *5-6. Judge Andrews' opinion does not closely detail the facts of the antitrust issues, including those pertaining to the relative timing of the expiration of the patents involved, so it is not clear whether they are materially different than the ones before us. Presumably, there was some significant distinction from *Transweb* — and there could indeed be scenarios where there is no antitrust injury because enforcement of the fraudulently obtained patent would not reduce competition — but all we can do here is decide the issues presented on summary judgment under *Transweb*.

980 F.2d 171, 198 (3d Cir. 1992) (quoting *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). To determine the product market, the factfinder considers price, use, and qualities of products to determine if "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.* at 199. Relevant submarkets can also exist, which can be shown by "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). However, submarkets may not always be appropriate. "[T]he boundaries of the relevant market must be drawn with sufficient breadth to include the competing products . . . and to recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326. Carlisle argues no reasonable juror could disagree that spray-foam guns are a reasonable product market.

Carlisle's expert, Dr. Mathur, tells us that spray-foam guns is a relevant antitrust market based on a variety of factors and tests, and Graco's expert, Dr. Maness, criticizes Dr. Mathur's findings. For example, Dr. Mathur conducted a hypothetical monopolist test to determine whether the market was properly defined. DI 322 at 11-13. Dr. Maness pointed out concerns with how Dr. Mathur conducted this test, including that Dr. Mathur "incorrectly presumes that the overall demand for spray guns is directly proportional to the demand for spray foam rigs" and that she failed to consider contractors' willingness "to extend the life of their existing guns

11

through refurbishment or enhanced maintenance." DI 370 at 8.[4] Carlisle argues that critiquing its expert's model only raises questions of fact on the margins which are not sufficient to raise a "genuine disputes of material fact." DI 411 at 6.

    We disagree. A reasonable juror could listen to Carlisle's expert, listen to Graco's expert, and then disbelieve Carlisle's expert on the basis of Graco's expert's arguments. Because Carlisle has the burden to establish the market at trial, the standard they must reach at summary judgment is stringent. *Nat'l State Bank*, 979 F.2d at 1582. Graco is not required to do more than to call Dr. Mathur's report into sufficient question such that a jury could disagree with her. Under Third Circuit precedent, we must "deny summary judgment even if no opposing evidentiary matter is presented," and there is certainly no requirement for the non-movant without the burden of proof to advance its own theory (rather than criticize the movant's). *Id.* It is enough that the jury may choose to disbelieve Dr. Mathur based on the critiques raised by Dr. Maness.[5]

    Additionally, there appear to be factual disputes about the practical indicia that could

---

[4] Carlisle's counsel deftly defended Dr. Mathur's propositions at oral argument and presented compelling argument for why spray-foam guns are a relevant antitrust market. However, the need for such back-and-forth argument on core points demonstrates the highly factual nature of market definition that we must leave to a jury in this case.

[5] This is true even in the absence of a *Daubert* motion. "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury . . . [a]n expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury. It is also . . . a proper subject for cross-examination." *Walker v. Gordon*, 46 Fed. Appx. 691, 695-96 (3d Cir. 2002).

define the market, especially as it pertains to substitutes.[6]  Carlisle argues that there are no reasonably interchangeable substitutes to spray-foam guns "because contractors cannot spray fast-setting foam insulation without a gun."  DI 322 at 10.  But that may be too narrow of a starting place.  Relevant market determinations should assess "the uses to which the product is put by consumers in general."  *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 438 (3d Cir. 1997).  It is not immediately clear why the market must be defined by what a spray-foam contractor does, as opposed to general contractors or other buyers of insulation.  A reasonable juror could find that the submarket of spray-foam guns is too narrow to constitute a relevant antitrust market.

### III.  Conclusion

For these reasons, we deny both Graco's motion for summary judgment, DI 323, and Carlisle's motion for partial summary judgment, DI 321.  The questions of monopoly power, antitrust injury, and market definition raise genuine disputes of material fact reserved for a jury.

---

[6] Graco stated that Carlisle cannot prove market definition through fact witnesses alone ("I have been doing antitrust litigation all my life.  You don't see[] parties come in and say well fact witness says you need a spray gun; we rest; we've proven the market.  You also rely on expert proof.")  DI 455 at 21:4-8.  Graco continued, arguing that market definition must be proven "through a properly conducted economic analysis."  DI 455 at 23:1-3.  Third Circuit precedent suggests otherwise.  In *United States v. U.S. Sugar Corp.*, the Third Circuit explained that it is permissible to "consider[] facts on the ground rather than relying upon [economic] analysis" and noted a lack of authority for the assertion that "the hypothetical monopolist test . . . governs market definition."  73 F.4th 197, 206 (3d Cir. 2023).  Perhaps it would be most *persuasive* for Carlisle to rely on a "properly conducted economic analysis," but Graco has not convinced us that the law mandates such an analysis to properly define a relevant antitrust market.